STATE v. CHARLES EASON.

*Indictment for Violation of Town Ordinance—Boundaries of Municipality — Navigable Stream — Low Water Mark — Thread of Stream.*

1. In North Carolina the test of navigability of a stream is whether it is navigable for sea-going vessels, and not whether it is subject to the ebb and flow of the tides.

2. A grant to a riparian owner, running with a navigable stream, extends only to the low water mark and not to the thread of the stream, and in defining the limits of an incorporated town bordering on such a stream the same rule of construction applies; therefore,

3. Where the State confers municipal powers upon a corporation and describes the boundary as running with a navigable river, the jurisdiction of such municipality does not extend beyond the low water mark in the absence of some provision in its charter ex- pressly or by fair implication extending the limit of its jurisdiction.

STATE *v.* EASON.

*Quære:* Whether a warrant charging generally the violation of an ordinance, which denounces eight prohibited offences, can be amended after verdict by inserting the specific charge of the commission of one of the prohibited acts.

This was a CRIMINAL ACTION, instituted before the Mayor of the town of Washington and tried on appeal in the Superior Court of BEAUFORT County, before *Graves, J.* The original affidavit and warrant were as follows:

"On the 21st of September, 1893, before me, E. M. Short, Mayor of Washington, N. C., personally appeared J. R. Grist, who, being duly sworn, complains on oath and says that Charles Eason did on the 20th of September, 1893, in violation of the town ordinance No. 11, in force in said town, contrary to the statute in such case made and provided and against the peace and dignity of the State." ·

*The Warrant.*—"You are hereby commanded forthwith to arrest Charles Eason and him safely keep so you have him before me, at my office in Washington, immediately to answer the above complaint and be dealt with as the law directs."

The amendment allowed after judgment and verdict was as follows: "Did unlawfully and willfully throw dead fish in the Pamlico river in said town, in violation of the town ordinance No. 11 of the town of Washington."

The amendment was inserted, as set forth in the statement of the Judge, and the material portions of the statement are as follows:

"*Ordinance No. 11.*—No sheep, goat or cattle shall be slaughtered for market within the corporate limits of the town; nor shall any fish be cleaned on the wharves, streets or lots of the town, except for the use of families in said town, and no dead fish or offal thrown into the river."

Penalty for the violation of this ordinance was five dollars.

The jury rendered a special verdict that the town of

Washington is bounded on the south by Pamlico river, which is a navigable stream, and the boundaries of the said town are set forth in chapter 110 of Private Laws of 1891, and the cedar post referred to is on the bank of the said river. That the fish-house hereinafter described is situated as follows: The northern sill of the said house rests upon the wharf-log, which said wharf-log is beyond the natural low water mark, being the end of the made-land which was made prior to 1891. That the wharf at the said point extends further out in the river than the wharves immediately to the east and west of the said wharf, and the said wharves mark the present shore line of said river and the present low water mark; that the water at the end of all of the said wharves is of sufficient depth to be navigated; that from said wharf said house is built on piles driven in the bed of the river and extending about thirty feet out from said wharf over the water; that the water of the river flowing under said house is of sufficient depth to be navigated if it were not for said piles; that the southern end of said house borders on the channel of the river; that Wynne and Gaskill have boats to land at said fish-house, from which boats they receive fish; that the river is about four hundred yards wide at this point; that ordinance 11 of the town forbids the throwing of dead fish into said river, and the penalty is five dollars; that on the 20th day of September, 1893, the defendant threw dead fish into said river from said fish-house; that the said fish-house was built over the said water by one J. R. Wynne under a license regularly issued by the Commissioners of Navigation for the port of Washington, granted on March 31, 1892; that if upon these facts the defendant is guilty in law the jury say for their verdict that the defendant is guilty, and if upon these facts in law he is not guilty the jury say for their verdict 'Not guilty.'"

Upon these facts the Court, being of opinion that the defendant was not within the corporate limits of the town, directed the jury to render a verdict of not guilty, and thereupon the jury, under the instruction of the Court, rendered a verdict of not guilty.

The Solicitor for the State, after verdict, moved to amend the warrant by inserting therein after the figures 1893 the following words, "Did unlawfully and willfully throw dead fish into the Pamlico river in said town, in violation of the town ordinance No. 11, of the town of Washington, N. C."

The Court allowed this amendment, and the defendant excepted.

*The Attorney General* and *Mr. Charles F. Warren,* for the State.

*Mr. W. B. Rodman,* for defendant.

Avery, J.: Our numerous long streams and large inland sounds come so clearly within the reason of the rule adopted on account of the different conditions in England, exclusively to waters subject to the ebb and flow of the tides, that it became necessary to establish here a new test of navigability in determining what submerged land should be reserved as the property of the State and what should be liable to appropriation by private persons by specific entry and grant or should pass as incident to patents issued to riparian proprietors. The criterion in North Carolina is whether the stream, bay or sound is navigable for sea-going vessels. *Broadnax* v. *Baker,* 94 N. C., 681; *Hodges* v. *Williams,* 95 N. C., 331; Angell on Water-courses, sec. 549, and note; *Collins* v. *Benbury,* 3 Ired., 277; *Fagan* v. *Armistead,* 11 Ired., 433. While the bed of a stream navigable or declared by the Legislature to be navigable for "sea vessels" is not subject to entry, the beds of streams that are

large enough to subserve the purpose of highways for smaller boats, floats, rafts and logs but insufficient for sea-going vessels may be granted specifically or pass by deeds of riparian proprietors on both sides, running with rivers and extending by construction *ad filum aquae*, but subject to the easement of the public to use the channel as a highway. *Bond* v. *Wool*, 107 N. C., 149; *State* v. *Glenn*, 7 Jones, 325; *Williams* v. *Buchanan*, 1 Ired., 535; *McNamee* v. *Alexander*, 109 N. C., 244. The legislation in North Carolina has been generally in affirmance of the new rule so much better adapted to the nature of this country. Our statutes, with the exception of a short interval, have never permitted the issuing of grants to private individuals for the beds of streams navigable for sea vessels, even though not affected by the tides, beyond the deep water line at most. *Bond* v. *Wool, supra;* 1 Potter's Rev., 278; Rev. Stat., ch. 42, sec. 1; Acts of 1777, ch. 114; *Hotsfield* v. *Grimstead*, 7 Ired., 139; *The Code*, §2751; Laws 1889, ch. 555; Laws 1893, ch. 17.

It follows, therefore, that a grant to a riparian proprietor, running with a navigable stream, such as the Pamlico river at Washington, from one designated point on its banks to another above or below on the same bank, must be so located as to extend, not *ad filum aquae*, but only to the low water mark along the margin of the stream. This Court having uniformly interpreted such calls in grants to individuals as designating the low water line, we know of no recognized rule of construction that would sustain us in giving a widely different meaning to the same language when used by the Legislature to define the limits of a town. Gould (in his work on Waters, section 202) says, in ascertaining the boundaries of towns: "The same rules of construction apply as in the case of a grant from one individual to another." A municipal corporation can exercise only such powers as are expressly granted by its charter or

are necessarily implied in or incident to the powers expressly granted. 1 Dillon on Corp., sec. 89; *Thompson* v. *Lee Co.*, 3 Wall., 320; *Thomas* v. *Richmond*, 12 Wall., 349. "Any ambiguity or doubt arising out of the terms used by the Legislature must be resolved in favor of the public." *Minturn* v. *Larue*, 23 Howard, 436.. A municipality being thus restricted to the exercise of powers clearly intended to be delegated, it would seem that, if the same rigid rule of construction does not obtain in determining the territorial limits to which its authority extends, the location of the geographical limit of its territorial jurisdiction should at all events be determined just as similar calls of grants to individuals are located. "Because the local jurisdiction of the incorporated place is, in most cases, confined to the limits of the incorporation, it is necessary" (says Dillon) "that these limits be definitely fixed." 1 Dillon, section 182 (124). But the Legislature unquestionably had the power to extend the jurisdiction of the town for police purposes to the middle of the river or to the opposite bank, and had the line been described as crossing the other side when it reached the river, and running thence along that shore to a point opposite the beginning, thence to the beginning, the effect would have been to extend the boundary for the exercise of the power to prohibit nuisance delegated to the town across the adjacent bed of the river, while the territorial limit of its authority for all purposes other than the exercise of police powers would have been the low water mark on the north bank. *Barber* v. *Connolly*, 113 U. S., 27; *Mugler* v. *Kansas*, 123 U. S., 123; *Palmer* v. *Hicks*, 6 Johns., N. Y.,133; *Ogdensburg* v. *Lyon*, 7 Lowring (N. Y.), 215. We are aware that the authorities in this country are conflicting as to the location of boundaries along inland navigable streams, whether the controversy grows out of fixing the limits of a town or locating the lines of grant.

We find that as a rule, however, the Courts in ascertaining the limits of towns have followed their own rulings as to riparian grants.    The common law doctrine was recognized and applied at an early day by the Courts of Massachusetts, New Hampshire, Connecticut, Maryland and Virginia, and later by Ohio, Illinois, Indiana, and some other States. Angell on Water-courses, section 547.    On the contrary, the common law rule was repudiated by Pennsylvania, North Carolina, South Carolina, Tennessee, Alabama, Michigan, and other States, and a doctrine somewhat similar to the rule of the civil law was substituted for that adopted in England.    Angell, *supra,* sections 548 to 552 ; 2 Am. and Eng. Enc., 505 ; 16 Am. and Eng. Enc., 236, *et seq; Ibid.,* 249 *et seq.*

In the comparatively recent case of Gilchrist's appeal, 109 Pa. St., 600, the Supreme Court of that State held that the limit of a municipality bounded by a navigable river is the low water mark of that river, unless express language to the contrary is used in the act of incorporation.    The question involved was whether the city of Wilkesbarre had the power to levy and collect a tax upon the coal beds under the bed of the river opposite to that city.    The right of the city was denied by the Court, and the decision rested upon the ground that a grant to an individual was construed to run with the low water mark of a navigable stream, and the same rule should be appplied in locating the boundaries of towns.

The Supreme Court of Michigan, in the *City of Coldwater* v. *Tucker,* 24 Am. Rep., 601, 36 Mich., 474, said: "The general doctrine is clear that a municipal corporation cannot usually exercise its powers beyond its own limits.    If it has in any case authority to do so, the authority must be derived from some statute which expressly or impliedly permits it.    There are cases where considerations of public

policy have induced the Legislature to grant such power."
See also, *People* v. *Bouchard*, 82 Mich., 158; Gould on
Waters, sec. 36.   In *Palmer* v. *Hicks*, 6 Johns., 132, and
*Styker* v. *The Mayor, etc., of N. Y.*, 19 Johns., cited for the
plaintiff, it appeared that the Legislature in both instances
had extended the line of a city or town across the bed of a
navigable stream to the opposite bank, and the Court decided
that the statutes extended the jurisdiction of the city for
police purposes with the extended line.   Any remark from
which an inference may be drawn as to the location of a
town limit, where the stream is called for, was therefore
*obiter*, if indeed such inference is deducible from the lan-
guage used by the Court.   The bed of a navigable stream,
said the Supreme Court of New York in *Ogdensburg* v. *Lyon*,
7 Low., 215, "is still State, not United States, territory,
and the State or its municipalities under its authority may
pass laws or ordinances" not in conflict with the Constitu-
tion of the United States or the laws of Congress enacted
within its constitutional powers.   In the case last cited the
question was whether the State could empower a city coun-
cil to pass ordinances to prevent the casting into the adja-
cent harbor of matter calculated to obstruct it, where the
authority had been delegated to the town by virtue of an
express statute conferring it, not as an incident to the usual
municipal powers, in the absence of a direct grant, expressly
or by fair implication, of that particular power.   In the
section of Horr & Bemis (Mun., Vol. I, 142) cited for the
prosecution it seems that the author, after embodying a
sentence from *Coldwater* v. *Tucker, supra*, in which the
Supreme Court of Michigan declared that a municipality
could extend its police jurisdiction beyond its territorial
limits only by virtue of a statute conferring such authority
expressly or by necessary implication, proceeds in the same
section to state as an inference drawn from the two cases

already cited from Johnston's reports the proposition that, where two towns are situated on opposite banks of the same river, and the boundaries of both run with the river, though it is navigable, the dividing line will be the thread of the stream. No such conclusion was fairly deducible from those decisions, because in both instances, as already stated, the whole bed of the stream had been expressly placed by statute under the police jurisdiction of one of the two riparian municipalities. Indeed, after a patient investigation of the whole subject, we have found but a single authority for the position that a grant calling for a navigable stream should be confined to the low water mark, while a similar line in the boundaries of a municipality should run with the thread of the stream, and the opinion in that case was evidently not well considered, as the point was decided without any discussion whatever.

We think the rule laid down by the Court of Pennsylvania and approved by Gould is the correct one—that the same construction which is given to the description of the *locus* conveyed in deeds and grants to individuals must be placed upon similar language when used to define the boundaries of a municipality. We conclude, therefore, that where the State confers municipal powers upon a corporation, and describes its boundary as running with a navigable river, the jurisdiction of the municipality does not extend beyond the low water mark in the absence of some other language in the charter extending the limit of its jurisdiction expressly or by fair implication. We can readily conceive how the decayed fish and offal thrown into a river like the Pamlico in front of Washington, where the influence of the tides is felt, may become an almost unendurable nuisance. But further annoyance might have been prevented by a proper amendment of the charter of the town, and may still be obviated by legislation in the

future.   Meantime, unless the powers of the Commissioners of Navigation, under section 3537, can be invoked to protect those who suffer from the stench by this offensive matter floating upon the river ·or lodging on the banks, we deem it more important that the Court should be reasonable and consistent in its rulings, so as to inspire confidence in their justice and stability, than that some of its citizens should be relieved without delay of even so sore a grievance.                    .

We think, therefore, that there was no error in the ruling of the Court below that even upon a warrant sufficient in form the defendant could not be convicted for a violation of the ordinance prohibiting the throwing of fish or offal into the river beyond the limit of its jurisdiction, the low water line, and the judgment must be affirmed.   In view of the peculiar hardship to the people interested of enduring this annoyance we suggest also an investigation of the question whether the facts as to the conduct of this particular defendant or the facts in any other case of creating a stench in the river, which is a public highway, by casting fish or offal into it, would sustain an indictment for nuisance at common law.   *Commissioners* v. *Sweency*, 131 Mass., 579; *State* v. *Wolf*, 112 N. C., 889.

Counsel on both sides discussed the question whether the Court had the power after verdict to amend the warrant, which before charged that the defendant " did on the 20th day of September, 1893, in violation of ordinance 11, section __, of the ordinances in force of the said town of Washington, contrary to the statute in such case made and provided and against the peace and dignity of the State," by inserting specific charge of throwing dead fish into Pamlico river.   As the ordinance embraced eight distinct charges that might have been made, seven others besides that set forth in the amendment, we deem it a matter of

such importance as to make it proper to say that the question is still an open one, which we refrain from discussing, because it is not essential to the final disposition of this particular case to do so.                    Affirmed.