G. HILLIARD ROSS, AS SOLE ACTING EXECUTOR AND TRUSTEE UNDER THE LAST WILL AND TESTAMENT OF WILLIAM O. ROSS, DECEASED, PROSECUTOR, v. MAYOR AND COUNCIL OF THE BOROUGH OF EDGEWATER AND THE BOROUGH OF EDGEWATER, DEFENDANTS.

Argued January 17, 1935—Decided September 25, 1935.

Before Justices HEHER and PERSKIE.

For the prosecutor, *William A. Kirk.*

For the defendants, *Milton T. Lasher.*

*Amici curiæ, David T. Wilentz,* attorney-general, and *J. Raymond Tiffany,* assistant attorney-general.

The opinion of the court was delivered by

HEHER, J.   The question presented by this *certiorari* is the validity of an ordinance adopted by the council of the borough of Edgewater and approved by the mayor on September 19th, 1933, entitled "An ordinance to regulate and to license the mooring, storage and maintenance of scows, barges and other vessels in the borough of Edgewater." It ordains that "no person shall," without the prescribed license, "place, store, moor, abandon or maintain any scow, barge or other vessel * * * in waters of the Hudson river, within the jurisdictional limits" of the borough. There is provision for an "annual" license, which the mayor and council may grant after a public hearing upon notice published in two local newspapers "at least once a week for two successive weeks," and posted on the *locus in quo,* "if in their judgment it is proper for the good government, order and protection of persons and property and for the preservation of the public

health, welfare and safety of the borough of Edgewater and its inhabitants;" and for a "temporary" license for a period not exceeding ten consecutive days, which may be issued by the mayor and council without a hearing, if justified by the considerations outlined above. The annual license fee is $5 for one scow, barge or other vessel, and $2.50 for each additional vessel within the same category. The temporary license fee is $2 for a vessel of like description, and $1 for each additional vessel. Penalties are prescribed for the enforcement of the ordinance.

The borough is situate on the west bank of the river Hudson, at this point a navigable water of the United States. It is a municipal corporation created on December 5th, 1894, under the General Borough act of 1878. 1 *General Statutes* (Revision of 1895), *p.* 175. Its easterly boundary is the Hudson river. The beginning point is "at the Hudson river;" the line proceeds inland in a general westerly direction, and the last course runs "northerly along the Hudson river to the place of beginning."

Prosecutor is the owner of a tract of land in the borough, bounded by the high water mark of the river for an approximate distance of seven hundred lineal feet; and he also holds a license issued by the state's board of commerce and navigation to "use the certain boat storage basin" situate upon the submerged littoral lands of the state fronting his uplands. It is stipulated that his lands extend to the mean high water mark of the river, and that the State of New Jersey is the owner of the lands below such line, subject to his "rights as the owner of the upland, and the rights of the United States government therein."

On July 9th, 1934, a complaint, under oath, was presented to the recorder of the borough, alleging that Adolph Koch, on the prior June 28th, in violation of the provisions of the ordinance, "did store, moor and maintain a vessel commonly known as a barge on the flat lands of the Hudson river, between the high and low water marks of said river," without having first obtained a license therefor, "said flat lands being within the jurisdictional limits" of the borough; and a complaint charging William F. Ingold, Jr., with a like

violation was filed on the same day. A summons commanding the appearance of the defendant was issued upon each complaint; but this *certiorari* was allowed before the termination of the proceedings thereon.

Prosecutor's lands are divided by a dock or pier running east and west. The northerly portion was leased to Koch, and the southerly part to Ingold. The former devotes his lands to the storage and repair of motor boats and pleasure yachts, while the latter employs his premises for the mooring and storage of scows, barges and other vessels, approximately eighty per cent. of which are registered under the act of congress in the coastal trade of the United States. There is evidence that all the boats, barges and scows stored on the premises leased to Ingold are used in foreign and interstate commerce, and that some of the yachts and pleasure craft stored in the basin maintained by Koch on his leased lands are also registered in the coastal trade. The latter's premises also contains a barge, used as a machine shop, and a float devoted to storage purposes.

Prosecutor's challenge is rested mainly upon fundamental considerations, viz.: (1) that the ordinance regulates and imposes a burden upon commerce on navigable waters of the United States with foreign nations and among the several states, in contravention of article I, section 8, clause 3 of the federal constitution; (2) that it lays a tonnage duty on vessels engaged in interstate and foreign commerce on the navigable waters of the United States, in violation of article I, section 10, clause 3 of that constitution; (3) that it is "an attempt on the part of the borough to take private property for public use without just compensation," in violation of the federal and state constitutions; (4) that it is, in certain particulars, arbitrary, unreasonable and discriminatory in character; and (5) that exclusive jurisdiction over the lands in question has been committed by the legislature to the state's board of commerce and navigation; that the municipality does not possess general powers to thus license and regulate the mooring, storage and maintenance of vessels so situated on navigable waters of the United States; and that, even so, its exercise is restrained, in virtue of the provisions

of article XV of the act concerning municipalities (*Pamph. L.* 1917, *pp.* 319, 358), as amended by chapter 215 of the laws of 1929 (*Pamph. L.* 1929, *p.* 406), as to the possessor of "a license or certificate issued by any department, board, commission or other agency of the State of New Jersey."

The attorney-general urges that the borough's territorial limit is the high water mark of the river, and there is no legislative grant of extra-territorial jurisdiction embracing the authority exercised by the ordinance at issue. On the contrary, it is insisted the legislature has expressly "entrusted its care" to the board of commerce and navigation.

The primary question, therefore, is whether the jurisdiction of the borough, in respect of the subject-matter of the ordinance, extends to the lands lying between the mean high and low water marks of the river, a distance of approximately five hundred feet.

The borough maintains that the challenged municipal action was a proper exercise of the police power, to prevent the abandonment of scows, barges and like vessels on these flat lands, and in the basins dredged thereout by the owners or occupants of the contiguous uplands. It is pointed out that these littoral lands "consist of soft river muck and silt," except where "dredged out or filled in by industrial plants located on the contiguous upland;" and that "these flat lands have been used as a convenient place for storing and abandoning all types of scows, barges and other vessels." It is said that many of these barges are used for residential purposes without adequate sanitary facilities; that their occupants "have constituted a difficult problem for police regulation, and necessitated an expenditure" of a substantial sum "for poor relief;" that a further resultant condition is an increase of the fire hazard; and that the regulations in question are needful for the public health and safety. It is asserted that the design of the governing body was the elimination of these objectionable conditions "on the flat lands lying in front of uplands which are put to no commercial use," and not to regulate, in any sense, commerce upon the waterway; and that the ordinance is so limited in scope and effect. It is pointed out that section 10 excepts from its operation "the

storage, mooring or maintenance of scows, barges or other vessels by an owner of lands under tide water, or by a lessee of said owner, if said scows, barges or other vessels are stored, moored or maintained on said lands under tide water as an incident to the use by said owner or lessee of uplands adjacent thereto."

. The borough, while not disputing that its easterly boundary is the Hudson river, maintains that, under the treaty negotiated between the States of New York and New Jersey in 1833, and ratified by the congress on June 28th, 1834 (4 *Comp. Stat., p.* 5356; 4 *U. S. Statutes at Large, p.* 708), the state's territorial boundary is the median line of the river, and that, "since it is the universal practice of the various states to subdivide their entire territory into counties and their counties into municipalities, the existence within a state of any portion of its territory without county or municipal relation is unheard of," and the jurisdiction of the borough is therefore not limited to the high water mark, but is "co-extensive with the jurisdiction of the State of New Jersey, in respect to the lands beneath the waters of the Hudson river adjacent to said borough;" citing *Leary* v. *Jersey City,* 208 *Fed. Rep.* 854; affirmed, 248 *U. S.* 328; 63 *L. Ed.* 271.

While this treaty established the boundary between the two states at the median line of the river, the third article thereof grants to the State of New York "exclusive jurisdiction of and over all the waters of the bay of New York, and of and over all the waters of Hudson river, lying west of Manhattan Island, and to the south of the mouth of Spuytenduyvel creek, and of and over the lands covered by the said waters to the low water mark on the westerly or New Jersey side thereof," subject to New Jersey's "exclusive right of property in and to the land under water, lying west of the middle of the bay of New York and west of the middle of that part of the Hudson river which lies between Manhattan Island and New Jersey;" and subject, also, to its "exclusive jurisdiction of and over the wharves, docks, and improvements made and to be made on the shore of the said state, and of and over all vessels aground on said shore, or fastened to any such wharf or dock, except that the said vessels shall be subject to the

quarantine or health laws, and laws in relation to passengers, of the State of New York;" and, as well, its "exclusive right of regulating the fisheries on the westerly side of the middle of the said waters, provided, that the navigation be not obstructed or hindered." This plainly comprehends the exercise by the State of New York of a general police jurisdiction, for the promotion of the interests of commerce and navigation, over the waters of the bay and river to the low water mark of the New Jersey shore, subject to this state's exclusive jurisdiction, with the exceptions noted, over the wharves, docks and improvements on its shore, and vessels aground on the shore, or fastened to any wharf or dock thereon. *State* v. *Babcock, 30 N. J. L.* 29; *Central Railroad Co.* v. *Jersey City, 70 Id.* 81; *affirmed, 72 Id.* 311; *affirmed, 209 U. S.* 473; *People* v. *Central Railroad Company of New Jersey, 42 N. Y.* 283; *Hall* v. *DeVoe Manufacturing Co., 14 Fed. Rep.* 183.

There is a contrariety of view as to whether municipal jurisdiction extends below the high water mark of a navigable tidal water by which the municipality is bounded. Some of the earlier cases hold that, in the ascertainment of the territorial limits of a municipality so bounded, the same rule of construction applies as in the case of private land so situated. *State* v. *Eason,* 114 *N. C.* 787; 19 *S. E. Rep.* 88; 23 *L. R. A.* 520, and note; *In re McDonough,* 30 *U. C. Q. B.* 288; *State* v. *Jersey City,* 25 *N. J. L.* 525; *Stewart* v. *Fitch and Boynton,* 31 *Id.* 17; 47 *L. R. A. (N. S.)* 1162, note; *Western Maryland Tidewater Railroad Co.* v. *Baltimore,* 106 *Md.* 561; 68 *Atl. Rep.* 6. In this state it is settled that the title of the riparian owner extends only to the high water mark. While a boundary on a non-navigable stream extends *ad medium filum aquæ,* in the case of bays, arms of the sea, and navigable rivers, it reaches only to the shore or ordinary high water mark. This was a principle of the common law. All the land below high water mark belonged to the British nation, and was vested in the king, as the head thereof, in trust for the public. It was vested by the revolution in the sovereignty of the state, and is held under the guardianship of the legislature. *Gough* v. *Bell,* 21 *N. J. L.* 156; *Same Case,* 22 *Id.* 441, 455; *affirmed, 23 Id.* 624; *Arnold* v. *Mundy,* 6 *N. J. L.*

1, 71; *Elizabeth* v. *Central Railroad Co.,* 53 *N. J. L.* 491; *Stevens* v. *Paterson and Newark Railroad Co.,* 34 *Id.* 532; *Martin* v. *Waddell,* 16 *Pet.* 387.

There is an essential difference, however, between the public easement in navigable waters and the title of the state to the underlying lands. "The former inheres in the state in its sovereign capacity. The latter is strictly proprietary." *Mayor, &c., of Hoboken* v. *Pennsylvania Railroad Co.,* 124 *U. S.* 656; 31 *L. Ed.* 543. It has been held in this state that, while the king at common law, especially after the grant of Magna Charta, was not possessed of the right to divest the people of their common right of navigation and of fishery, in navigable waters, in virtue of his proprietary interest in the soil thereunder, the dominion of parliament over the *jura publica* was absolute and unlimited, and the legislature is possessed of like omnipotent authority to regulate, abridge or vacate public rights in navigable rivers, except in the field reserved to congress by the federal constitution. *Stevens* v. *Paterson and Newark Railroad Co., supra.* The doctrine of this case is that the public has no rights in such waters so fundamental as to be beyond legislative impairment. Be that as it may, the dominion of the state is subject to the paramount power of congress to control the navigation of such waters to the extent necessary for the regulation of foreign and interstate commerce. *Scott* v. *Lattig,* 227 *U. S.* 229; 57 *L. Ed.* 490; *Mayor, &c., of Hoboken* v. *Pennsylvania Railroad Co., supra.*

Yet, by ancient usage, the owner of the upland contiguous to the shore, in the absence of legislative restriction, could, where no nuisance was created, either in the nature of an obstruction to the common right of fishery or of navigation, or otherwise, "appropriate the shore between high and low water marks to his own use." He was privileged to "extend his improvements by wharves and filling up over the shore in front of his lands to low water mark, unless prevented by the state," provided he did not injuriously interfere with the "paramount right of navigation;" and thereby he acquired an indefeasible right of property in the soil. While this has been termed a mere license or privilege, it was nevertheless a

right in the riparian owner to thus appropriate the shore between high and low water marks to his "exclusive use;" and, when executed, the license became irrevocable, and the inchoate right, by public acquiescence, ripened into an exclusive and indefeasible right of property. Such license was revocable only before execution. *Gough* v. *Bell*, 22 *N. J. L.* 441; *affirmed*, 23 *Id.* 624, 628; *Stevens* v. *Paterson and Newark Railroad Co., supra; Slate* v. *Jersey City, supra; Stewart* v. *Fitch and Boynton, supra*. This was a local custom or usage which acquired the force of a local common law.

And, until the state interfered and deprived him of the privilege, the owner of the *ripa* on a navigable river, from early times, had the right in this state to pass directly from his property on to the shore thereof; and any obstructions placed in the river, which deprived him of this right, constituted a public nuisance, and he thereby suffered that pecuniary and special damage necessary under the law to sustain an action by him. He also had the right of fishery in the adjacent tide waters, exclusive of the common right of fishery in all public waters conferred by the common law. This privilege was good against all persons except the state or its grantee. *Stevens* v. *Paterson and Newark Railroad Co., supra; Fitzgerald* v. *Faunce*, 46 *N. J. L.* 536, 591, 599.

This local common law has not been entirely abrogated by statute. While the owner of lands bounding upon the tide waters of the Hudson river, New York bay and Kill von Kull, lying between Enyard's dock, on the Kill von Kull, and the New York state line, by force of the statute relating to riparian rights, may not, without the grant or permission of the board of commerce and navigation, fill in the adjacent tide water with solid material, or erect or maintain any pier or other structure, beyond the bulkhead or pier lines, as the case may be, established by the statute, the privilege of holding the accretions and of passing directly from his property on to the shore, and the adjacency right of fishery, remain unimpaired; and he is accorded, in respect of the contiguous shore land, a pre-emptive right to a grant or license authorized by the statute. 4 *Comp. Stat., p.* 4384, ¶¶ 8, 9, 10, 15. See *Amos* v. *Norcross*, 58 *N. J. Eq.* 256; *Fitzgerald* v. *Faunce,*

*supra; American Dock and Improvement Co.* v. *Trustees of Public Schools,* 39 *Id.* 409; *Point Breeze Ferry and Improvement Co.* v. *Bragaw,* 47 *Id.* 298.

The jurisdiction of a municipal corporation over the shore of a navigable water by which it is bounded is no less than that of the private riparian owner. And, for obvious reasons, the description of municipal boundaries is not construed with the same strictness as those outlining the boundaries in grants or contracts. *McQuillan on Municipal Corporations (2d ed.)* 707. The prevailing rule seems to be that, where the boundary is described as running with a navigable river, the municipal jurisdiction does not extend beyond low water mark, in the absence of some provision in the charter or legislative grant enlarging the jurisdiction. *State* v. *Eason, supra;* 19 *R. C. L.* 699; *McQuillan on Municipal Corporations (2d ed.)* 712. See note 23 *L. R. A.* 521; 45 *Id.* 243; 47 *Id.* (*N. S.*) 1161, 1165. When it was a mere question of jurisdiction, that of the common law courts extended to low water mark. *Sir Henry Constable's Case,* 3 *Rep.* 107; *Gough* v. *Bell,* 21 *N. J. L.* 156, 163. And the boundaries of a municipality bordering on navigable waters may be extended, for the purposes of jurisdiction, by the building of wharves, piers or structures, permanently filled in with earth and extending into the water. *Treuth* v. *State,* 120 *Md.* 257; 87 *Atl. Rep.* 663; 47 *L. R. A.* (*N. S.*) 1161.

It logically results from the foregoing that the police jurisdiction of the borough extends to the low water mark of its shore lands. It is not to be presumed that the legislature intended to withhold from this municipal corporation, designed to serve the needs, convenience and comforts of its residents, powers necessary to attain those ends. Such a construction is in entire harmony with our scheme of government which employs the municipal corporation to supply the local needs of its residents. In *Leary* v. *Jersey City, supra,* it was held that the lands lying beneath the waters of the New York bay adjacent to the New Jersey shore, and held in private ownership by a grant of the State of New Jersey, were taxable by the contiguous municipality, which was "bounded on the southeast by the New York harbor." It was pointed

out that, in virtue of the treaty with New York State, the lands were within the sovereignty and jurisdiction of the State of New Jersey, and "are, for taxing purposes, within the limits of Jersey."

We find no legislative purpose expressed in any of the statutes cited by prosecutor, or implicit therein, to withhold from this municipality, in respect of these contiguous littoral lands, the police power so essential to the well-being of every community. The authority here exercised is fairly within the powers conferred by section 2 of article XIV and section 1 of article XXVIII of the act relating to municipalities, and section 28 of the Borough act. *Pamph. L.* 1917, *pp.* 357, 420; 1 *Comp. Stat., p.* 239, as amended by chapter 187 of the laws of 1914, page 347.

And the borough was not deprived of its authority in the premises by the licenses, granted by the board of commerce and navigation, "to use a boat storage basin" upon the lands in question. The proviso in article XV of the act concerning municipalities, *supra,* incorporated by chapter 215 of the laws of 1929 (*Pamph. L.* 1929, *p.* 406), is manifestly not applicable. This is a limitation only upon the power vested in the municipality to grant the business and occupational licenses therein enumerated; none of the provisions therein contained comprehends the authority exercised in the adoption of the instant ordinance. The authority lodged in the board of commerce and navigation to make grants or leases of the state's riparian lands is not, by force of the statute or otherwise, inconsistent with the existence of the police power in the municipality in respect thereof. As pointed out, such lands, after a grant or lease thereof, become subject to taxation by the municipality. *State* v. *Collector of Jersey City,* 24 *N. J. L.* 108; *Leary* v. *Jersey City, supra.* And, by the same token, they are within the police jurisdiction of the municipality. *Mayor, &c., of Hoboken* v. *Pennsylvania Railroad Co., supra.*

Nor is chapter 274 of the laws of 1918 (*Pamph. L.* 1918, *p.* 1022), classifying as a nuisance and a misdemeanor "the mooring, grounding or otherwise attaching or fastening of boats, barges, or rafts to or upon the riparian lands of the

state, and permitting the same to remain so moored, grounded or otherwise attached for a period of ten days," and vesting in the board of commerce and navigation authority to abate the nuisance, a negation of the municipality's general police power to deal with a nuisance of this character. Such a legislative purpose is not expressed, nor is it fairly to be implied.

We are thus brought to a consideration of the constitutional questions raised.

This ordinance does not impose a burden on foreign or interstate commerce, within the intendment of the commerce clause of the federal constitution. Its design is plainly not to raise revenue, but to promote and secure, in the exercise of the police power, the common welfare in the particulars mentioned. It is directed to a legitimate end within the sphere of state sovereignty; and its provisions are reasonable and appropriate to that end. The license fees meet the test of validity prescribed for purely regulatory measures in the exercise of the police power. *North Hudson County Railway Co.* v. *Hoboken,* 41 *N. J. L.* 71. It is not the pretended exercise of this power, so essential to the common welfare, to cloak the regulation of foreign or interstate commerce by the imposition of burdens thereon; no direct and material burden is thereby placed on such commerce. The dominant aim is the elimination .of local nuisances inimical to the health, safety and general welfare of the inhabitants of the borough—not the impeding of the free flow of navigation, or the regulation or taxing thereof, or the laying of a direct burden thereon. The language used in describing the vessels to be licensed makes evident the purpose. The general words are, on well-settled principles, restrained and controlled by the prior specific enumeration. *Ejusdem generis.*

The states cannot, under any guise or form, impose direct burdens upon foreign or interstate commerce; they cannot tax such commerce either by laying the tax upon the business which constitutes commerce of that character, or the privilege of engaging in it, or upon the receipts, as such, derived therefrom. *Lemke* v. *Farmers' Grain Co.,* 258 *U. S.* 50; 66 *L. Ed.* 458; *Simpson* v. *Shepard,* 230 *U. S.* 352; 33 *S. Ct.* 729; 57 *L. Ed.* 1511. But a state statute enacted for admissible

state purposes, which affects interstate commerce only incidentally and remotely, is not within the prohibition of this constitutional provision. *Shafer* v. *Farmers Grain Co.,* 268 *U. S.* 189; 69 *L. Ed.* 909; *Sligh* v. *Kirkwood,* 237 *U. S.* 52; 35 *S. Ct.* 501; 59 *L. Ed.* 835; *Sherlock* v. *Alling,* 93 *U. S.* 99; 23 *L. Ed.* 819; *Geer* v. *Connecticut,* 161 *U. S.* 519; 16 *S. Ct.* 600; 40 *L. Ed.* 793; *Munn* v. *Illinois,* 94 *U. S.* 113; 24 *L. Ed.* 77. And thus is classified the reasonable exercise of the police power to serve legitimate public needs.

As was said by Chief Justice Chase, in *Steamship Co.* v. *Portwardens,* 73 *U. S.* (6 *Wall.*) 31; 18 *L. Ed.* 749, the commerce clause was not designed "to interfere with the exercise of state authority upon subjects properly within state jurisdiction. The power to enact inspection laws is expressly recognized as not affected by the grant of power to regulate commerce. And many other powers, the exercise of which may, in various degrees, affect commerce, have always been held not to be within the grant to congress. To this class it is settled belong quarantine and other health laws, laws concerning the domestic police, and laws regulating the internal trade of a state."

Here the requirement of a license for the purpose specified, and the payment of the designated fee, do not constitute the levying of a tax upon interstate or foreign commerce, or the privilege of engaging therein, or upon the receipts, as such, derived from the conduct of business so classified. At most, it merely affects such commerce. It is not the regulation or the placing of a burden thereon. Compare *Fincklen* v. *Taxing District of Shelby County,* 145 *U. S.* 1; 36 *L. Ed.* 601; *Cooley* v. *Board of Wardens,* 12 *How.* 299; 13 *L. Ed.* 996; *The License Cases,* 5 *How.* 504; 12 *L. Ed.* 256; *Clark* v. *Poor,* 274 *U. S.* 554; 71 *L. Ed.* 1199; *Hendrick* v. *Maryland,* 235 *U. S.* 610; 35 *S. Ct.* 140; 59 *L. Ed.* 385; *Kane* v. *New Jersey,* 242 *U. S.* 160; 37 *S. Ct.* 30; 61 *L. Ed.* 222; *The Pendleton Case,* 122 *U. S.* 359; *Gibbons* v. *Ogden,* 9 *Wheat.* 1, 186.

The apposite principle is well stated by Mr. Justice Johnson, in his concurring opinion in *Gibbons* v. *Ogden, supra* (at *p.* 235): It is no objection to the existence of distinct,

substantive powers, that, in their application, they bear upon the same subject. The same bale of goods, the same cask of provisions, or the same ship that may be the subject of commercial regulation, may also be the vehicle of disease. And the health laws that require them to be stopped and ventilated, are no more intended as regulations on commerce than the laws which permit their importation are intended to inoculate the community with disease. Their different purposes mark the distinction between the powers brought into action; and while frankly exercised they can produce no serious collision." And as was observed by Mr. Justice Pitney, in *Ames* v. *Kirby,* 71 *N. J. L.* 442, 445: "But even the interstate commerce is subject to be occasionally prevented or interfered with by the incidental operation of state laws and regulations established under the reserved police powers of the state; and if these be reasonable in character, not intended as a regulation of commerce but intended to promote the heatlh, peace, good order and welfare of the citizens, such laws and regulations are not invalid in the absence of exclusive legislation by congress upon the subject, although their enforcement may measurably hamper commercial intercourse between the states."

Nor are the license fees exacted by the ordinance properly classable as a tonnage tax which the state may not levy without the consent of congress. "Tonnage duties are duties upon vessels in proportion to their capacity. * * * The vital principle of such a tax or duty is that it is imposed, whatever the subject, solely according to the rule of weight, either as to the capacity to carry, or the actual weight of the thing itself." *Inman Steamship Co.* v. *Tinker,* 24 *L. Ed.* 118. While not decisive, one of the tests applied to determine whether the license fee exacted falls within the classification of a tonnage tax, is whether "the amount * * * is graduated by the tonnage" of the vessel. *Wiggins Ferry Co.* v. *East St. Louis,* 107 *U. S.* 365; 27 *L. Ed.* 419; *Steamship Co.* v. *Portwardens, supra; The State Tonnage Tax Cases,* 79 *U. S.* 204; 20 *L. Ed.* 370; *Peete* v. *Morgan,* 86 *U. S.* 581; *Cannon* v. *New Orleans,* 87 *U. S.* 577; 22 *L. Ed.* 417. But, applying the conclusive test laid down in *Wiggins Ferry Co.* v.

*East St. Louis, supra,* the license fee imposed by this ordinance is not a "duty of tonnage;" it is not in its essence, "a contribution claimed for the privilege of using a navigable river of the United States or of arriving or departing from one of its ports. * * *"

It is not a hindrance or impediment to free navigation. *Keokuk N. L. Packet Co.* v. *Keokuk,* 95 *U. S.* 86; 24 *L. Ed.* 377. It is not a tax or duty levied upon ships and vessels as instruments of commerce and navigation. *State Tonnage Tax Cases (Cox* v. *Lott), supra.* It was a legitimate exercise of the police power—a domain in which the congress, granting its power, did not assume exclusive jurisdiction. This was not the case in *Steamship Co.* v. *Portwardens, supra,* relied on by prosecutor. There the Louisiana statute under review authorized the master and wardens of the Port of New Orleans to demand and receive, in addition to other fees, the sum of $5, whether called upon to perform any service or not, for every vessel arriving in that port; and it was held to be in contravention of the federal constitution, both as regards the commerce clause and that barring the state from "laying a duty of tonnage." It was pointed out that the enactment subjected the vessel to the demand of the master and wardens "whether they be called on to perform any service or not." This was obviously a tax imposed upon every vessel arriving at the port, for the privilege of landing or mooring. See, also, *Cannon* v. *New Orleans, supra.* Such is manifestly not the case here. The license fees imposed obviously will not yield more than the reasonable expense of making effective the police regulations embodied in the ordinance. As pointed out, the fee so prescribed is not a tax at all; it is not in any sense of the term the levying of a duty upon the vessel as an instrument of commerce.

And there is no substance to the claim that the ordinance operates to take private property for a public use without compensation. Its provisions are in no sense unreasonable, arbitrary or discriminatory. It is well settled that all personal and property rights are held subject to the reasonable exercise of the reserve element of sovereignty termed the

"police power." *State Board of Milk Control* v. *Newark Milk Co.*, 118 *N. J. Eq.* 504, 519; *Hourigan* v. *Township of North Bergen*, 113 *N. J. L.* 143.

We are not called upon to discuss the point that "the enforcement of the ordinance is and has been discriminatory and is not now and has not been general in its character." The sole question here is the validity of the ordinance. *Cliffside Park Realty Co.* v. *Cliffside*, 96 *N. J. L.* 278; *Koettegen* v. *Paterson*, 90 *Id.* 698; *Siciliano* v. *Township of Neptune*, 83 *Id.* 158; *Neumann* v. *Hoboken*, 82 *Id.* 275; *Rosencrans* v. *Eatontown*, 80 *Id.* 227; *North Jersey Street Railway Co.* v. *Jersey City*, 75 *Id.* 349; *Pennsylvania Railroad Co.* v. *Jersey City*, 47 *Id.* 286.

None of the remaining points urged requires discussion.

Writ dismissed, with costs.