THE STATE v. ELIJAH D. WILLIS.

*Oysters—Statute, Construction of.*

"A natural oyster-bed," as distinguished from an "artificial oyster-bed," in the sense in which those terms are employed in *The Code,* is defined to be one not planted by man, and is any shoal, reef, or bottom where oysters are to be found growing, not sparsely or at intervals, but in a mass or *stratum* in sufficient quantities to be valuable to the public.

This was a CRIMINAL ACTION, tried on appeal from a Justice of the Peace, before *Shipp, J.,* at Spring Term, 1889, of CARTERET Superior Court.

The trial was on the warrant of a Justice of the Peace, issued under section 3393, last clause of said section, contained in ch. 43, vol. II, of *The Code,* entitled, "Oysters and other Fish," charging the defendant with taking oysters from the oyster-gardens of one John D. Chadwick, on or about the 20th day of February, 1888, without permission of said Chadwick first had.

The defendant pleaded "Not guilty," contending that the said bed staked off and enclosed was "a natural oyster-bed," and any citizen had a right to take oysters therefrom, under the last clause of section 3390 of *The Code.*

The jury returned the following special verdict:

"That the prosecutor John D. Chadwick has had his oyster-garden made and staked out in Carteret County, according to the requirements of the statute, and obtained a license, or grant, from the Clerk of the Superior Court of Catawba County for the same; that the defendant took oysters therefrom, within the stakes where the garden was laid off, without permission of said John D. Chadwick first had; that there were no oyster-rocks within the stakes where the garden was so laid off, but that there were some oysters within the same, but they were scattering, and oysters naturally grew there; that the area embraced within the stakes, which was two and three-fourths acres, was not such as would, within itself, induce the public to resort to it and get oysters, but in connection with the oyster-rocks and oysters near by, the public were in the habit of taking oysters from the said area and adjacent territory for livelihood and for market. ·

"If upon the foregoing statement of facts the Court be of opinion that the defendant is guilty, then the jury say he is guilty; but if upon said statement the Court is of opinion that defendant is not guilty, then the jury find that he is not guilty."

Whereupon, the Court adjudged that the defendant is not guilty, and from this judgment the Solicitor appealed.

*The Attorney General,* for the State.
*Mr. Charles R. Thomas, Jr.,* for the defendant.

SHEPHERD, J.—after stating the facts: As early as 1822 the attention of our Legislature was directed to the protection of the oyster interests in the waters of this State, and a statute was enacted inflicting a penalty upon "masters and skippers" from transporting oysters out of the State, and also prohibiting the use of any instrument except tongs in their taking.

In those days the natural oyster-beds were considered amply sufficient to meet the demands of the public, and it

was only deemed necessary to extend to them the protection of the law as above stated.

In 1858 the law-makers, appreciating the importance of increasing the quantity, as well as improving the quality of oysters, passed a statute very similar in its provisions to those of sections 3390, 3391, 3392, 3393 of the present *Code.* These sections provide that any inhabitant "may make a bed in any of the waters in this State and lay down or plant oysters or clams therein, having first obtained a license" from the Clerk of the Superior Court of the proper county. It is further provided, that in his petition he shall describe particularly the place where he desires to make such bed, and that he may stake out such grounds, not exceeding ten acres, and that he shall hold the same in fee. If, however, he has included within his stakes any *natural oyster or clam-bed*, or a space containing more than ten acres, or if he shall fail for the period of two years, either to use such bed or keep it properly designated by stakes, he shall forfeit such license. The act also provides that if any one shall injure such bed or stakes, or shall gather or take away any oysters within the lines of the same without the permission of the owner, he shall be subject to a penalty and also to indictment. There is a *proviso*, however, "that nothing herein shall be construed to * * * authorize any person to * * * stake off and enclose any natural oyster or clambed, or in anywise to infringe the common right of the citizens of the State to any such natural bed."

Much uncertainty existing as to what parts of the waters were subject to entry and grant under this law, a commission was appointed under ch. 119, Acts 1887, to make a survey and *finally* determine and locate the natural oyster-beds, in order that such entries and grants could be intelligently and safely made. This was done, and it seems that the purpose of the law has been accomplished, so that no such question as is presented here can generally arise, except as

to grants made before that time. For some reason, best known to the Legislature, the above act was confined to the waters north of Core Sound, and has no application to this case. Core Sound and all the waters south of it, therefore, are governed by the sections of *The Code* referred to, thus leaving the location of the natural oyster and clam-beds in said sound to the Courts and juries, as the cases arise.

We are therefore directly confronted with the difficult duty of defining a "natural oyster-bed."

Although the cultivation of oysters obtained among the Romans in the days of Pliny (who speaks of it in one of his writings), and has since been carried on extensively in Italy, France, England and other countries, we have been unable to obtain from them any light upon the particular question before us. In England, as with us, great care has always been taken to preserve to the public the common right of fishery, so that in granting privileges for oyster culture this public right has not been impaired to any material extent. Hence, as we have seen, the Legislature, while encouraging the cultivation of oysters, has provided that natural oyster or clam-beds shall not be subject to entry.

In 1885, Lieutenant Francis Winslow, of the United States Navy, was detailed, at the request of the Legislature, to make a "survey of the natural oyster-beds and private oyster-gardens, together with an examination of the waters of the State with reference to the possibilities for the culture of shell-fish," &c. His report presents, with much intelligence, the different theories advanced as to what is a natural oyster-bed.

He says: "In carrying out the first special requirement of the resolution, a difficulty experienced in all oyster localities was at once encountered. The question arose here, as elsewhere, as to what was properly 'a natural oyster-bed.' Naturally, that question had to be answered before the natural beds could be surveyed and located. Very few people know what is or what constitutes a natural oyster-bed. Indeed, it is only a matter

of opinion at the best, and opinions are likely to be influenced largely by self-interest. A large number of persons make a distinction between oyster-beds that ebb dry and those that are covered at all states of the tide—a distinction which, it is needless to say, does not have any foundation to rest upon. Many also appear to think that a natural bed is not a 'natural bed,' in the meaning of the law, because it is a little one. On the other hand, there are some whose definition of natural bed is so liberal that it not only covers all places where oysters were in the past or in the present, but includes any area where they might, could, would or should grow in the future. Arguments have been made to the effect that, as the drifting 'spat' was evidently a product of nature, wherever the 'spat' attached or oysters grew, that spot became a natural oyster-bed. Evidently such a view would preclude any system of oyster culture. On the other hand, it has been argued that small groups and bunches of oysters, separate and distinct from any considerable area, were not natural beds within the meaning of the law. A legal decision (by Judge Goldsborough, of Maryland) defines a natural bed as one not made by man, and of sufficient area to have been profitably worked by the general public, as common property, within some recent period of time. This decision has been practically adopted by the Shell-fish Commission of Connecticut, in defining the natural beds of that State, and this course has been approved by legislative enactment. Useful as a guide, however, it would not be proper to be strictly governed by the Goldsborough decision in defining the natural beds in North Carolina. In this State, the oyster industry is yet in its infancy The population is too sparse, and the present demand too slight, to have caused any continuous fishery, or even any general knowledge of the positions or areas of the natural beds. Mere testimony as to previous fishery, or non-fishery, would not, therefore, in all places be conclusive."

It is not easy, from these conflicting theories, to deduce a satisfactory definition. We think that it is the capacity of the bottom to attach what fishermen call the drifting "spawn," or "spat," which distinguishes a natural from an artificial oyster-bed, but it will not do to confine this capacity to the inherent character of the soil, since many beds which are now considered natural may owe their origin to artificial causes, such as the deposit of brush, shells, drift-wood and other objects to which the young oysters have adhered, and thus, after many years, resulted in the formation of a stratum which fulfills, in every way, the common idea of a natural bed. Neither can it, with reason, be said that every part of the bottom to which oysters *may* adhere, or to which they do adhere and grow, will constitute such a bed, as they may be found scattered here and there in such small quantities as to be of but little value to the public, and such a theory would prevent entries and thus defeat the purpose of the law in encouraging their cultivation.

Something more permanent and valuable is meant by the word "bed." Webster's Dictionary (1st ed.) and the Century Dictionary give as one of the definitions of *bed* "a layer, a *stratum*, an extended mass of anything, whether upon the earth or within it, as a bed of sulphur, a bed of sand or clay"; and so the verb *bed*—"to lay in a stratum, to stratify, to lay in order or flat, as bedded clay," &c. This view is well illustrated by the *stratum* of marl to be seen in the banks of many of our eastern rivers, and the marl-pits in the eastern part of this State, the same being composed, mainly and in many cases, entirely of oyster-shells, with alluvial deposits above. These considerations would exclude, therefore, the "scattering" growth of oysters which is to be found in many parts of the waters, and which is too small in quantity to be of value to the public.

104—49

We think that a natural, as distinguished from an artificial, oyster-bed, is one not planted by man, and is any shoal, reef or bottom where oysters are to be found growing, not sparsely or at intervals, but in a mass, or *stratum*, and in sufficient quantities to be valuable to the public. This definition, we think, is more in accord with the spirit of our Legislature than that of Judge GOLDSBOROUGH. The latter, in our opinion, lays too much stress upon the *area*, and involves an inquiry into the methods of taking oysters and remuneration for the labor and capital employed. Too many elements of uncertainty enter into it to be of practical use in this State, where the cultivation of oysters is in its infancy and their taking by the public is not exclusively for the purpose of sale and profit.

While it seems impossible to give a more particular definition, it is believed that the one we have adopted reflects the true spirit of the law and may be of some practical use in ascertaining where grants may be made.

The application of the principles we have laid down to the case before us is easy. The special verdict finds that, although oysters naturally grew within the stakes, they were scattering and insufficient in quantity to induce the public to resort to them alone as a means cf livelihood or "for market." The verdict also negatives the existence of "oyster-rocks," a species of oyster-beds. It is very clear that the verdict does not bring this case within the definition which we have formulated, and we are, therefore, of the opinion that his Honor committed an error when he held that the area in question was a natural oyster-bed.

Error.