STATE OF NORTH CAROLINA, EX REL. GRACE H. ROHRER, SECRETARY OF THE NORTH CAROLINA DEPARTMENT OF ADMINISTRATION v. SIDNEY ARTHUR CREDLE

No. 480PA87

(Filed 30 June 1988)

**Waters and Watercourses § 6— taking oysters in navigable waters—public trust doctrine—no prescriptive use**

Defendant was not entitled to a jury trial on the issue of whether he acquired the exclusive right to harvest oysters by prescription in Swan Quarter Bay where the State enjoyed a presumption of title under N.C.G.S. § 146-79; defendant's predecessors in title could only have obtained a perpetual franchise during a twenty-two year period which ended in 1909; defendant could not link himself to the Hayes franchise granted in that period; the court re-

fused to indulge in the lost grant fiction to infer that a grant issued as a result of an application by S. S. Mann; the waters in question were navigable; and the public trust doctrine and N.C.G.S. § 113-206(f) applied.

ON discretionary review of a unanimous decision of the Court of Appeals affirming the orders dismissing defendant's claims and defenses and granting the State's motion for partial summary judgment, and the final judgment granting the State's further motion for summary judgment, entered 25 October 1984, 3 May 1985 and 5 May 1986 in Superior Court, HYDE County, by *Watts, Brown (Frank R.),* and *Small, JJ. State ex rel. Rohrer v. Credle,* 86 N.C. App. 633, 359 S.E. 2d 45 (1987). Heard in the Supreme Court 14 April 1988.

*Lacy H. Thornburg, Attorney General, by Daniel F. McLawhorn, Special Deputy Attorney General, and J. Allen Jernigan, Assistant Attorney General, for the State.*

*Davis & Davis, by Geo. Thomas Davis, Jr., for defendant-appellant.*

*Conservation Council of North Carolina, by John D. Runkle, General Counsel, amicus curiae.*

MEYER, Justice.

The question presented is whether defendant is entitled to a jury trial to determine if he acquired an exclusive right by prescription to harvest oysters from an oyster bottom in navigable waters. The Court of Appeals resolved the question against defendant. We affirm.

In 1982 the State of North Carolina brought an action to quiet title to a 640-acre tract of land in Hyde County, most of which is submerged land beneath the waters of Swan Quarter Bay, its arms and tributaries. This is a navigable body of water. *State v. Spencer,* 114 N.C. 770, 777, 19 S.E. 93, 96 (1894). In his answer, defendant asserted a claim of ownership to the land, based either on certain grants or on adverse possession. The instruments upon which he relied included (1) two deeds to his father, one from S. S. Mann and the other from Zeb Hayes, which purported to convey portions of a 640-acre grant that the State had made to Joseph Hancock in 1786, (2) a perpetual franchise to take oysters from ten described acres that the State had granted

to J. W. Hayes in 1889 and (3) an application filed in 1891 by S. S. Mann for a perpetual franchise to cultivate shellfish in 640 described acres. The two deeds to defendant's father purported to convey a two-fifteenths undivided interest in the Hancock grant, but defendant admitted in interrogatories that he could not establish that the property was ever partitioned or divided. Defendant contended that the Mann franchise application had resulted in a shellfish grant for the property, but he could not produce the document granting such franchise. Defendant also contended in his answer that in any event he had acquired the exclusive right to harvest oysters from the bottom by prescriptive use. He grounded this contention on the claim that he and his father possessed the land and had been harvesting oysters from the bottom under a claim of right continuously since 1917.

On 25 October 1984, Judge Watts dismissed the claim which relied on the 1786 land grant to Joseph Hancock because defendant had failed to answer certain interrogatories relating to the chain of title connecting him to the 1786 grant. On 3 May 1985, Judge Brown granted partial summary judgment in the State's favor, dismissing defendant's claims that he owned the land by adverse use or prescriptive use, the latter on the express ground that the exclusive right to harvest oysters from the State's submerged lands could not be acquired by prescriptive use. On 5 May 1986, Judge Small granted final summary judgment in the State's favor, ruling that, as a matter of law, (1) defendant admitted that he could not bring his chain of title forward from the 1889 Hayes franchise and (2) defendant could not prove that the State issued a perpetual franchise as a result of the 1891 Mann application. The trial court found that the deeds defendant claimed as links in his chain of title did not describe the tracts described in the Hayes franchise and the Mann franchise application. Finally, the court concluded that defendant had not shown and did not possess a connected chain of title either to the Hayes grant or to the Mann application, so that he could not rebut the presumption of title in the State under N.C.G.S. § 146-79. The State was declared the owner of the submerged lands. Defendant appealed.

Although defendant appealed from all the orders and judgments entered against him, he expressly abandoned all his assignments of error except those relating to his claim of prescriptive

use. The Court of Appeals unanimously held that the exclusive right to take oysters from lands under navigable waters in this State could not be acquired by prescriptive use. Defendant petitioned this Court for discretionary review under N.C.G.S. § 7A-31, which was allowed on 2 December 1987.

At common law the English sovereign owned the sea and the lands over which the tide ebbed and flowed, but this ownership was subject to restraints imposed by the rights of the people to use, for example, the waters for fishing and navigation and the riverbanks and seashores for towing and drying nets. The concept of the "public trust" doctrine evolved from the theory that presumed that the Crown held title to tidal lands and waters for the benefit of the public. *Martin v. Waddell's Lessee*, 41 U.S. (16 Pet.) 367, 10 L.Ed. 997 (1842). *See* T. J. Schoenbaum, *Public Rights and Coastal Zone Management*, 51 N.C.L. Rev. 1 (1972).[1] When the Union was formed, the original thirteen states (including North Carolina) succeeded, in place of the English sovereign, to the ownership of the sea and lands with its concomitant restraints. *Id.; see also Shively v. Bowlby*, 152 U.S. 1, 38 L.Ed. 331 (1894); *Phillips Petroleum Co. v. Mississippi*, --- U.S. ---, 98 L.Ed. 2d 877 (1988). As new states were admitted to the Union they also became owners in trust in this fashion. *Phillips Petroleum Co. v. Mississippi*, --- U.S. ---, 98 L.Ed. 2d 877; *Barney v. Keokuk*, 94 U.S. 324, 24 L.Ed. 224 (1877).

In *Illinois Cent. R.R. v. Illinois*, 146 U.S. 387, 435, 36 L.Ed. 1018, 1036 (1892), the United States Supreme Court referred to the well-settled principle "that the ownership of and dominion and sovereignty over lands covered by tide waters" passed to the various states after the Revolution. In that case, the Supreme Court expanded the public trust doctrine to include not only waters sub-

---

1. For the history and development of the public trust doctrine, both in England and in this country, see, for example, L. Butler & M. Livingston, *Virginia Tidal and Coastal Law* (1988); 1 *Waters and Water Rights* §§ 33-44 (R. Clark ed. 1967); Comment, *The Public Trust in Tidal Areas: A Sometime Submerged Traditional Doctrine*, 79 Yale L.J. 762 (1970); Comment, *Defining Navigable Waters and the Application of the Public Trust Doctrine in North Carolina*, 49 N.C.L. Rev. 888 (1971). *See also* M. Kalo & J. Kalo, *The Battle to Preserve North Carolina's Estuarine Marshes: The 1985 Legislation, Private Claims to Estuarine Marshes, Denial of Permits to Fill, and the Public Trust*, 64 N.C.L. Rev. 565 (1986).

ject to the ebb and flow of the tides, but also those that were navigable in fact. *Id.* at 435-36, 36 L.Ed. at 1036. *See Collins v. Benbury,* 25 N.C. (3 Ired.) 277, 282 (1842) ("any waters, which are sufficient in fact to afford a common passage for all people in sea vessels, are to be taken as navigable."). Under the public trust doctrine, each state could regulate or dispose of its tidal lands, provided that it could be done "without substantial impairment of the interest of the public in the waters." *Illinois Cent. R.R. v. Illinois,* 146 U.S. at 435, 36 L.Ed. at 1036. In a now famous passage, the United States Supreme Court stated:

> [Title to soil under navigable waters] is a title different in character from that which the State holds in lands intended for sale. It is different from the title which the United States hold in the public lands which are open to preemption and sale. It is a title held in trust for the people of the State that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein freed from the obstruction or interference of private parties.

*Id.* at 452, 36 L.Ed. at 1042. *See* L. Butler & M. Livingston, *Virginia Tidal and Coastal Law* § 5.2, at 127 (1988).

This Court recognized the public trust doctrine in *Land Co. v. Hotel,* 132 N.C. 517, 44 S.E. 39 (1903). In deciding that a grant to a riparian owner of land covered by navigable water conveyed no more than an easement and that a conveyance of the land adjoining the navigable water conveyed an easement in the portion of the land covered by the water, the Court quoted the passage above with approval and noted that "[t]he policy of the State from 1777 until 1854 was . . . to preserve its title to the navigable waters, as the same had been held by the King of England, in trust for the free use of all its citizens." *Id.* at 533, 44 S.E. at 44. In *Land Co.,* this Court dealt with a land dispute which arose after the State had chartered the Atlantic and North Carolina Railroad Company in 1852. The railroad was to have its eastern terminus at what is now Morehead City. The Court stated:

> Considered in the light of the then existing conditions, it is difficult to believe that the policy of the State for nearly a century was to be reversed and the growth of the prospective seaport was to be hampered by the grant of the absolute ownership of the entire water-front thereof, separate and

distinct from the ownership of the abutting lands; that the State was to part with this property which it held in trust for all of its citizens. Nothing, save a clear declaration of such purpose, would justify this conclusion.

*Id.* at 534, 44 S.E. at 44. *See also Development Co. v. Parmele*, 235 N.C. 689, 695, 71 S.E. 2d 474, 479 (1952) (navigable waters are of public right); *Ward v. Willis*, 51 N.C. (6 Jones) 183, 185-86 (1858) ("The same public purposes require that, [in North Carolina,] as in England, the State should reserve lands [under navigable waters] from private appropriation; . . . although it may please the Legislature [sic] to dispose of them by special grant for the promotion of trade and the growth of a commercial town, accessible to vessels."). Navigable waters, then, are subject to the public trust doctrine, insofar as this Court has held that where the waters covering land are navigable in law, those lands are held in trust by the State for the benefit of the public. A land grant in fee embracing such submerged lands is void. *Land Co. v. Hotel*, 132 N.C. 517, 44 S.E. 39; *Wilson v. Forbes*, 13 N.C. (2 Dev.) 31 (1828). Swan Quarter Bay is a navigable body of water. *State v. Spencer*, 114 N.C. 770, 777, 19 S.E. 93, 96 (1894).

One of the exceptions to the rule that the benefit and enjoyment of North Carolina's submerged lands is available to all its citizens, subject to reasonable legislative regulation, for navigation, fishing and commerce, relates specifically to shellfish. It is this exception upon which defendant must build his claim to the exclusive right to harvest oysters by prescription from the waters of Swan Quarter Bay.

In 1896 the State Board of Agriculture wrote about North Carolina's shellfish as follows:

In the saline waters of North Carolina abound oysters, clams, scallops, crabs, shrimp, and diamond-back terrapin, in perfection of flavor. In commercial importance the oyster is of far greater value than all the others combined.

It happens that there remains one treasure-house not yet plundered, one great water granary whose doors are not yet thrown wide open. North Carolina, overlooked and despised in the Eldorado of the Chesapeake, now, when the glories of the latter are fading, is found to possess what, with pru-

dence, patience, legislative wisdom and local self-control, may be converted into a field quite as prolific as the once teeming oyster waters of Maryland and Virginia.

State Board of Agriculture, *North Carolina and its Resources*, Shellfish, at 151-52 (1896). Legislative wisdom had already revealed itself in a series of statutes designed to encourage the cultivation of oysters, while at the same time providing that natural oyster beds were not subject to exclusive entry. *State v. Willis*, 104 N.C. 764, 10 S.E. 764 (1889). A system of licenses for the cultivation of shellfish in non-natural beds was instituted. These were issued by the clerks of court of common pleas and quarter sessions. 1858-1859 N.C. Sess. Laws ch. 33. *See State v. Young*, 138 N.C. 571, 50 S.E. 213 (1905).[2] In 1887 the General Assembly passed "An act to promote the cultivation of shell-fish in the state." 1887 N.C. Sess. Laws ch. 119. The statute provided for a survey and map to be made

> of all the natural beds, and of all the grounds which may have been occupied under authority of previous acts for the growing, planting or cultivation of shell-fish, and upon completion . . . the board of commissioners of shell-fisheries shall determine the location, area, limits and designation of each and every public ground . . . [which] are to include the natural beds, together with such additional areas adjacent thereto as may be deemed . . . necessary to provide for the natural expansion of the . . . natural beds.

1887 N.C. Sess. Laws ch. 119, § 4. The statute covered Hyde County. *State v. Spencer*, 114 N.C. 770, 776, 19 S.E. 93, 95 (1894). The statute went on to provide that

> any person or persons desiring to raise, plant or cultivate shell-fish upon any ground . . . which has not been designated as public ground . . . may . . . make an application in writing . . . for a franchise for [this] purpose . . . .

---

2. For a comprehensive survey of the statutes relating to shellfish cultivation, see B. Thorsen, *Origins and Early Development of the North Carolina Division of Commercial Fisheries, 1822-1925* (thesis, 1982). *See also* Comment, *Estuarine Pollution: The Deterioration of the Oyster Industry in North Carolina*, 49 N.C.L. Rev. 921 (1971).

. . . [Upon receipt of an auditor's certificate] [t]he secretary of state . . . shall grant to the applicant a written instrument conveying a *perpetual franchise* for the purpose of raising and cultivating shell-fish in and to the grounds for which application is made; and the said written instrument of conveyance shall be authenticated by the governor, countersigned by the secretary and recorded in his office. The date of the application for the franchise and a description of the ground for which such franchise was granted shall be inserted in each instrument, and no grant shall issue except in accordance with a certificate from the engineer of the commissioners of shell-fisheries as to the area, limits and location of the grounds in which the said franchise is to be granted, and every person obtaining such grant or franchise shall, within three months from the receipt of the same, record said written instrument in the office of the register of deeds for the county wherein the said grounds may lie and shall define the boundaries of the said grounds by suitable stakes, buoys, ranges or monuments; *but no franchise shall be given in or to any of the public grounds* as determined by the commissioners of shell-fisheries, and all franchises granted under this or previous acts shall be and remain in the grantee, his heirs and legal representatives.

1887 N.C. Sess. Laws ch. 119, §§ 5, 6 (emphasis added). *See State v. Spencer*, 114 N.C. 770, 19 S.E. 93. These grants of perpetual franchises were subject to two provisos: the holder had to demonstrate an "actual effort to raise and cultivate shell-fish" on the specified grounds and no grant was to be more than ten acres in size. 1887 N.C. Sess. Laws ch. 119, § 6.

In 1909 the legislature passed an act specifically "to promote the cultivation of the oyster in North Carolina." 1909 N.C. Sess. Laws ch. 871. This act provided that:

Any citizen of North Carolina . . . shall be granted the privilege of taking up bottoms for purposes of oyster or clam culture . . . of an area not less than one acre nor more than fifty acres.

1909 N.C. Sess. Laws ch. 871, § 2. The "privilege" was in the form of a lease, for which written application was required. Once again, a proviso existed.

As soon as possible after the application is received, the Shellfish Commissioner shall cause to be made a survey and map of said bottom, at the expense of the applicant. The Shellfish Commissioner shall also thoroughly examine said bottoms by sounding and by dragging thereover a chain to detect the presence of natural oysters. Should any natural oysters be found, the commissioner shall cause examination to be made to ascertain the area and density of oysters on said bottom or bed, to determine whether the same is a natural bed . . . . No application shall be entertained nor lease granted for a piece of bottom within two hundred yards of a known natural bottom, bed or reef.

1909 N.C. Sess. Laws ch. 871, § 3. After the survey and map were made,

the Shellfish Commissioner shall execute to the applicant . . . a lease for the bottoms applied for. A copy of the lease, map of the survey and a description of the bottom, defining its position, shall be filed in the office of the Shellfish Commissioner.

1909 N.C. Sess. Laws ch. 871, § 4. The leases were of twenty years' duration, with renewal periods of ten years. 1909 N.C. Sess. Laws ch. 871, §§ 5, 7. Failure to pay the rental on a lease resulted in its forfeiture. 1909 N.C. Sess. Laws ch. 871, § 8. This Act repealed the Act of 1887 permitting "perpetual franchises" to be granted. 1909 N.C. Sess. Laws ch. 871, § 10. There was, therefore, a "window" period of twenty-two years (1887-1909) during which an exclusive right pursuant to a *perpetual* franchise to harvest oysters from a *cultivated, non-natural* oyster bottom could be obtained. The "window" closed with the Act of 1909, replacing the franchise system with the lease system.

The lease system has been in force since that date and the statutes relating to oyster cultivation have been updated in the intervening years. *See* N.C.G.S. §§ 113-201.1 through -208 (1987). Leases are granted in order "[t]o increase the use of suitable areas underlying coastal fishing waters for the production of shellfish." N.C.G.S. § 113-202(a) (1987). The Marine Fisheries Commission may grant the leases to North Carolina residents "when it determines [that] the public interest will benefit." *Id.* The leased area must not contain a natural shellfish bed. N.C.G.S.

§ 113-202(a)(2) (1987). Further, "[t]he Marine Fisheries Commission, in its discretion, may lease or decline to lease public bottoms in accordance with its duty to conserve the marine and estuarine resources of the State." N.C.G.S. § 113-202(h) (1987). Leases are of ten years' duration, with renewals for periods of ten years. N.C.G.S. § 113-202(i) (1987).

In 1965, in an effort to clear title to lands claimed under perpetual franchises or rights of fishery pursuant to the 1887 Act, the legislature enacted N.C.G.S. § 113-205. This statute provides in pertinent part:

> Every person claiming to any part of the bed lying under navigable waters of any coastal county of North Carolina or any right of fishery in navigable waters of any coastal county superior to that of the general public must register the grant, charter, or other authorization under which he claims with the Secretary. Such registration must be accompanied by a survey of the claimed area, meeting criteria established by the Secretary for surveys of oyster and clam leases. All rights and titles not registered in accordance with this section *on or before January 1, 1970*, are hereby declared null and void.

N.C.G.S. § 113-205(a) (1987) (emphasis added). The term "coastal county" includes Hyde County. *Id.*[3] The statute further provides:

> In the interest of conservation of the marine and estuarine resources of North Carolina, the Department of Natural Resources and Community Development may institute an action in the superior court to contest the claim of title or claimed right of fishery in any navigable waters of North Carolina registered with the Secretary. In such proceeding, the burden of showing title or right of fishery, by the preponderance of the evidence, shall be upon the claiming title or right holder.

N.C.G.S. § 113-206(d) (1987). Moreover, the statute provides that:

---

3. During discovery in the case *sub judice* the State acknowledged that the Marine Fisheries Commission had so far recognized five such private oyster bottoms.

>       In evaluating claims registered pursuant to G.S. 113-205,
> the Secretary shall favor *public ownership of submerged
> lands and public trust rights.*

N.C.G.S. § 113-206(f) (1987) (emphasis added). The statute further
mandates that a plan to resolve these claims by December 31,
1990, shall be established. *Id.*

The people of North Carolina endorsed the public policy
behind these legislative actions in 1972 by adopting a constitu-
tional amendment which is now section 5 of article XIV of this
state's constitution. The section provides in part:

>       It shall be the policy of this State to conserve and pro-
> tect its lands and waters for the benefit of all its citizenry,
> and to this end it shall be a proper function of the State of
> North Carolina and its political subdivisions to acquire and
> preserve park, recreational, and scenic areas, to control and
> limit the pollution of our air and water, to control excessive
> noise, and in every other appropriate way to preserve as a
> part of the common heritage of this State its forests, wet-
> lands, estuaries, beaches, historical sites, open-lands, and
> places of beauty.

N. C. Const. art. XIV, § 5 (amend. 1972).

Four basic points emerge from our examination of the
background of the case before us. (1) Because of our recognition of
the public trust doctrine, no title in fee can be granted to lands
submerged beneath navigable waters. (2) The exclusive cultiva-
tion and harvesting of oysters is permitted only where no natural
oyster bed exists. (3) The "perpetual franchise" system existed
only for a period of twenty-two years ending in 1909. A lease
system is now in force. (4) Our state constitution mandates the
conservation and protection of public lands and waters for the
benefit of the public.

With these points in mind, we turn to defendant's claim that
he acquired his right to harvest oysters in navigable waters by
prescription. "Prescription means literally 'before written.'"
Hetrick, *Webster's Real Estate Law in North Carolina* § 319, at
343 (rev. ed. 1981). The claim was based on a legal fiction that a
claimant's land usage and a sufficient lapse of time raised the
presumption that the usage must have been based originally on a

"lost grant." *Id.; Draper v. Conner*, 187 N.C. 18, 121 S.E. 29 (1924). This is precisely the situation here. Defendant maintains that the S. S. Mann franchise application submitted under the terms of the 1887 shellfish cultivation act providing for perpetual franchises resulted in the grant of a franchise to S. S. Mann. Defendant's attorney stated on oral argument before this Court that he located the actual grant in 1969, but he apparently failed to make a copy of it, since he could not produce it for the superior court's perusal. He stated that he has been unable to relocate the grant in the State Archives. Defendant did, however, produce an affidavit from the Register of Deeds of Hyde County that two deed books are unavailable, one having been burnt in a fire and the other having disappeared approximately fifty years ago. We have no way of knowing, nor is it even alleged, that either or both of the deed books contain a grant from the State for the harvesting of oysters in the area in question. The record before us contains only a copy of the S. S. Mann franchise application. We are invited, in effect, to indulge in the legal fiction of the "lost grant" to divest the State of its title based on the proposition that defendant and his father have harvested oysters in Swan Quarter Bay since 1917. We decline to do so.

This is not a case of two private parties engaged in a dispute over land. Rather, one of the parties here is the State, which enjoys a presumption of title under N.C.G.S. § 146-79. The presumption of title in the State can only be defeated by the opposing party's showing of a "good and valid title to such lands in himself." N.C.G.S. § 146-79 (1983). Our review of the statutes relating to shellfish cultivation reveals that defendant's predecessors in title could only have obtained a perpetual franchise under Chapter 119 of the 1887 Session Laws during the twenty-two-year "window" period which closed in 1909. 1909 N.C. Sess. Laws ch. 871, § 10. The superior court specifically found that defendant admitted (1) that he could not bring his title forward from the 1889 Hayes perpetual franchise and (2) that he could not prove that the State had issued a perpetual franchise as a result of the 1891 S. S. Mann franchise application. Since defendant cannot link himself to the Hayes franchise, he is unable by that document to rebut the presumption of title in the State. Neither can he infer that a grant issued as a result of the S. S. Mann franchise application.

State ex rel. Rohrer v. Credle

The public trust doctrine and N.C.G.S. § 113-206(f) also weigh against defendant. This Court has held that no exclusive right to fish in navigable streams exists. *Skinner v. Hettrick et al.*, 73 N.C. 53 (1875). The general common law rule is that "no right in natural oyster beds can be gained by prescription against the state." Gould, *A Treatise on the Law of Waters*, at 49 (3d ed. 1900). Defendant maintains that he has planted oysters on the bottom in question here. His argument appears to be that because he did so, the bottom was not a natural oyster bed. We cannot assume from this bare assertion, however, that the oyster bed to which defendant lays exclusive claim to harvest is solely the result of *cultivation*. Once again, because defendant cannot produce the S. S. Mann franchise document, we are unable to conclude that the requisite certificate from the engineer of the commissioners of shell-fisheries issued under the statute granting perpetual franchises. 1887 N.C. Sess. Laws ch. 119, § 6. The issuance of such a certificate was a condition precedent to the grant of a perpetual franchise. *Id.* Defendant cannot show that S. S. Mann, his claimed predecessor in title, ever met the condition precedent. Finally, the legislature has mandated that in evaluating claims of the type upon which defendant builds his prescription theory, the public ownership of submerged lands and public trust rights shall be favored. N.C.G.S. § 113-206(f) (1987). In the face of this mandate, the rocks of defendant's arguments are no more than shifting sands. As Chief Justice Clark wrote in *State v. Twiford*, 136 N.C. 603, 609, 48 S.E. 586, 588 (1904):

> Navigable waters are free. They cannot be sold or monopolized. They can belong to no one but the public and are reserved for free and unrestricted use by the public for all time. Whatever monopoly may obtain on land, the waters are unbridled yet.

History and the law bestow the title of these submerged lands and their oysters upon the State to hold in trust for the people so that all may enjoy their beauty and bounty. We hold that under the public trust doctrine, coupled with defendant's failure to link himself to the Hayes franchise or to produce a grant from the State to S. S. Mann for a perpetual franchise to cultivate shellfish in Swan Quarter Bay, its arms and tributaries, defendant is not entitled to a jury trial on the issue of whether he

acquired the exclusive right to harvest oysters by prescription in those waters. The decision of the Court of Appeals is therefore

Affirmed.