FROM CRAVEN.
The defendant's intestate on 7 September, 1818, conveyed to the plaintiff a tract of land "beginning at the mouth of North or Jimmy's creek, and thence running down/Trent river to the line of land formerly belonging to Mrs. Edwards; thence along that line north, 5 degrees east, 400 poles, to the back line of Castage's patent; thence west with said *Page 22 
patent line to a branch now called Springfield branch; thence (31) down said branch to a cypress at the mouth thereof — Castage's corner; thence down the various courses of said North or Jemmy's creek to the beginning, being part of the land granted to James Castage by patent bearing date 12 November, 1713."
The deed contained the following covenants:
"And the said Thomas O. Bryan, for himself and his heirs, doth covenant with the said George Wilson, his heirs and assigns, that he hath good right and absolute authority to grant, bargain and sell the premises aforesaid; that the said premises are free and clear from every incumbrance; that there are within the lines aforesaid hereby granted and conveyed not less than 387 acres of land, and that he will warrant and defend the same to the said George Wilson, his heirs and assigns, against the lawful claims of all persons. And the said George Wilson covenants with the said Thomas O. Bryan that upon a resurvey of the premises hereby granted, should there be a greater quantity of land than the said Thomas O. Bryan hath herein warranted, that is to say, than 387 acres, the said George Wilson will pay to the said Thomas O. Bryan for every acre above the said quantity herein warranted at the rate of $20 the acre."
The only breach was of the covenant of seizin.
A survey of the land was made, and a plat of it was part of the case, which is represented by the annexed diagram:
[EDITORS' NOTE: THE DIAGRAM IS ELECTRONICALLY NON-TRANSFERRABLE.], SEE 13 N.C. 22.] *Page 23 
Castage's patent was produced on the trial; the back lines of (32) it were as follows: "From a hickory (contended by the defendant to be either at C or G in the diagram) S. 80 degrees W. 100 poles to a poplar at the side of a branch, thence S. 35 degrees W. 40 poles, S. 51 W. 40 poles, thence S. 82 W. 36 poles, to the mouth of the creek, then, etc."
The plaintiff contended, that the lines denoted in the diagram by the letters A, B, C, and D, and Springfield branch to its mouth at K, and thence down Jemmy's creek to its mouth at A, was the boundary described in the deed, and that the covenant of seizin applied to all the land within those limits.
The defendant contended that the back lines of his deed were the back lines of Castage's patent, wherever they were, and that (33) those lines were designated on the diagram either by the letters A, B, C, D, E, F and K, or by the letters A, B, G, H, I, J and K, leaving out of the boundaries of the deed the land in the bend of Springfield branch. Between these two boundaries there were two plantations, one of which had been cleared for 25 years, and the other for a longer period — both held adversely to the title of the defendant.
By the survey it appeared that there were within the boundary contended for by the plaintiff 400 acres of land, and within those designated by the letters A, B, C, D, E, F and K, measuring to the margin of Jemmy's creek, 348 acres, the title of which was undisputed; that between the thread or middle of the creek, and its margin at low-water mark, there were 7 acres of land covered with water, and consequently, that by measuring to the middle of the creek, there were within the last-mentioned boundaries 355 acres.
Jemmy's creek enters into Trent River a few miles above Newbern; it is 60 yards wide at its mouth; becomes wider higher up, and its average width to the mouth of Springfield branch, is from 60 to 100 yards. The depth of water at its mouth is 12 or 15 feet, and from 6 to 8 feet to the mouth of Springfield branch. There exists in it no regular ebb and flow of the tide corresponding to that of the ocean. But the tide ebbs and flows in it in the same way that it does in the Neuse and Trent rivers. It is navigated by the owners of the adjacent land with flats loaded with wood.
It was in proof that the plaintiff had cleared and cultivated a field in the bend of Springfield branch, for 10 or 12 years before the trial in the Court below.
His Honor instructed the jury that Jemmy's creek was a navigable water-course, and that the true boundary of the land on the (34) side of the creek was the edge of the water at low-water mark, and not the thread of middle of the channel; that the boundary of the land *Page 24 
conveyed by the deed, and which was within the covenant of seizin, was the lines of the plat until it struck Springfield branch, and then the meanders of that, and that if adverse possession of any of the land included within that boundary was held by any person at the date of the deed the covenant of seizin was broken; and further, that if the defendant had not title at the date of his deed to all the land within the meanders of Springfield branch, there was also a breach of his covenant; that if they found for the plaintiff, the rule of damages, if the land had been paid for, was the price paid for it, and the interest; that if the land had not been paid for, the rule was to give the difference between the price to be given and the real value, if it was greater than the agreed price; that if the plaintiff, availing himself of the deed, and of a continued possession under it for 7 years, had thereby acquired an undefeasible title, the damages should be nominal.
The jury returned a verdict for the plaintiff, and assessed the damages $780 principal, and $473.85 interest; and judgment being rendered accordingly, the defendant appealed.
It is clear that by the rule adopted in England, navigable waters are distinguished from others, by the ebbing and flowing of the tides. But this rule is entirely inapplicable to our situation, arising both from the great length of our rivers, extending far into the interior, and the sandbars and other obstructions at their (35) mouths. By that rule Albemarle and Pamlico sounds, which are inland seas, would not be deemed navigable waters, and would be the subject of private property. What general rule shall be adopted, this case does not require me to determine, were I competent to it. But I think it must be admitted that a creek or river, such as this appears to be, wide and deep enough for sea vessels to navigate, and without any obstruction to this navigation from its mouth to the ocean, and the limit of whose waters is not higher nor as high as the flowing of the tides upon our sea coasts, is a navigable stream within the general rule. I therefore concur with the Judge below that the margin of the water was the boundary of the grant, and that the land covered by the water, to the middle of the stream, was not to be taken into computation in ascertaining the quantity.
I concur also with the Judge that the covenants of the deed were broken if the deed covered lands of which the grantor was not seized — *Page 25 
that is, authorized to sell and convey at the date of the deed, yet that the grantee was entitled to nominal damages only if the plaintiff's possession under the deed had ripened into a good title under the statute of limitations. And from the clear and explicit manner in which he makes the latter declaration, and his refusal to grant a new trial, I must understand that the adverse possession spoken of, for more than 25 years, between the two lines C, E, K, and C, H, K, was accompanied with color of title, embracing all the lands comprehended in the deed to which the grantor had not title, and especially the lands lying in the bend of the branch; for without such color the doctrines of the Judge would have led to a different verdict, and it seems he approved of the verdict in this case, for he refused to grant a new trial. This view of the case is much strengthened by the fact that these possessions were adverse, which presupposes color of title, at least beyond the limits of actual occupancy. But at most this was matter of evidence, and we will presume that it tended to establish such facts as support the (36) verdict. It is unnecessary to examine into the correctness of the charge making the actual value of the lands and not the price given the measure of damages — that is, enabling a plaintiff to recover damages for the fancied loss of a good bargain, as in this case it produced no practical results. I am of opinion, therefore, that the rule for a new trial should be discharged.