RICHARD BARBEE GWATHMEY, JR., AND WIFE, GWENDOLYN BROWN GWATHMEY, ROBERT F. CAMERON AND WIFE, ELIZABETH BECK CAMERON, AND ELIZABETH BECK CAMERON, LOUISE DeR. SMITH, ROBERT Y. KELLY AND WIFE, ELSIE W. KELLY, AND IN THE MATTER OF: WACHOVIA BANK OF NORTH CAROLINA, N.A., EDITH R. MERRILL AND BARBARA M. WALSER, TRUSTEES UNDER THE WILL OF LESLIE M. MERRILL v. THE STATE OF NORTH CAROLINA, ACTING THROUGH ITS AGENCY, THE DEPARTMENT OF ENVIRONMENT, HEALTH, AND NATURAL RESOURCES, ACTING THROUGH ITS SECRETARY, WILLIAM W. COBEY, JR., AND THE DIVISION OF MARINE FISHERIES, ACTING THROUGH ITS DIRECTOR, DR. WILLIAM T. HOGARTH, AND THE SUBMERGED LANDS PROGRAM, ACTING THROUGH ITS DIRECTOR, P.A. WOJCIECHOWSKI

No. 74PA94

(Filed 8 December 1995)

### 1. Common Law § 1 (NCI4th)— common law of England— applicability

The common law referred to in N.C.G.S. § 4-1 has been held to be the common law of England as of the date of the signing of the American Declaration of Independence, and the term "common law" has been stated to refer to the common law of England and not of any particular state. However, that statement is incomplete and may be misleading because, at least since 1715, the common law of England was applicable in North Carolina only to the extent it was deemed "compatible with our way of living." Further, the express wording of N.C.G.S. § 4-1 makes it clear that only those parts of the English common law which had been "in force and use" in North Carolina and which were not contrary to the freedom and independence of North Carolina are to be applied. Much of the common law that is in force by virtue of N.C.G.S. § 4-1 may be modified or repealed by the General Assembly, except that any parts of the common law which are incorporated in our Constitution may be modified only by proper constitutional amendment.

**Am Jur 2d, Common Law §§ 1, 2, 4, 13.**

### 2. Waters and Watercourses § 55 (NCI4th)— navigability— lunar tides test

The lunar tides test for determining navigability was never part of the English common law applied in North Carolina before or after the Revolution, is therefore not a part of the common law of North Carolina, and is inapplicable to the conditions of the waters within the state.

**Am Jur 2d, Waters §§ 59-73.**

**3. Waters and Watercourses § 55 (NCI4th)— navigability— relationship to public trust doctrine—test**

The controlling law of navigability as it relates to the public trust doctrine in North Carolina is that if a body of water in its natural condition can be navigated by watercraft, it is navigable in fact, and therefore, navigable in law, even if it has not been used for such purpose. Lands lying beneath such waters that are navigable in law are the subject of the public trust doctrine.

**Am Jur 2d, Waters §§ 59-73.**

**4. Waters and Watercourses § 56 (NCI4th)— lands beneath navigable waters—conveyance by State—public trust doctrine**

No constitutional provision throughout the history of North Carolina has expressly or impliedly precluded the General Assembly from conveying lands beneath navigable waters by special grant in fee simple and free of any rights arising from the public trust doctrine, which is a common law doctrine and cannot, in the absence of a constitutional basis for the doctrine, be used to invalidate acts of the legislature which are not proscribed by our Constitution. The public trust doctrine in North Carolina thus operates as a rule of construction creating a presumption that the General Assembly did not intend to convey lands in a manner that would impair public trust rights; however, this presumption is overcome by a special grant from the General Assembly expressly conveying lands underlying navigable waters in fee simple and without reservation of any public trust rights.

**Am Jur 2d, Waters §§ 74-81.**

**5. Waters and Watercourses § 67 (NCI4th)— marshlands and swamplands—conveyance by State Board of Education— public trust rights**

Either the Board of the Literacy Fund or the State Board of Education as its successor in interest was at all times vested with title to the vacant marshlands and swamplands in the State after an 1825 act, and title to those lands continued to be held by the SBE until our statutes regarding the control and disposition of all State lands were amended in 1959. However, in no statute enacted by the General Assembly from 1825 to the present has that body ever expressly stated that it was granting the Literacy

Fund or the SBE fee simple title to the marshlands free of all public trust rights whatsoever, and the presumption arising under the public trust doctrine has not been rebutted and prevails. The General Assembly did not convey the marshlands covered by navigable waters to the SBE free of any applicable public trust rights and therefore the SBE could not convey such lands to the plaintiffs' predecessor in title free of such public trust rights.

**Am Jur 2d, Waters §§ 378 et seq.**

6. **Waters and Watercourses § 67 (NCI4th)— marshlands— public trust rights—application of N.C.G.S. § 146-20.1**

Applying N.C.G.S. § 146-20.1 in this case to impose public trust rights on any parts of marshlands not covered by navigable waters and which are therefore free of public trust rights would be contrary to N.C.G.S. § 146-83, which provides that no provision of chapter 146 shall be applied or construed to the detriment of vested rights or interests acquired prior to June 2, 1959.

**Am Jur 2d, Waters §§ 378 et seq.**

7. **Trial § 146 (NCI4th)— title to marshlands—stipulation— contrary allegation added to complaint—no error**

The trial court did not err in an action involving the title to marshlands by expanding one complaint to add an allegation inconsistent with a stipulated fact. Even though stipulations are encouraged by the courts, they will be restricted to the intent manifested by the parties in the agreement. The trial court here properly concluded that the plaintiff did not intend to admit anything other than what the deed said and did not intend to waive any rights concerning her claim to this marshland.

**Am Jur 2d, Stipulations §§ 1, 7, 8, 12.**

8. **Waters and Watercourses § 55 (NCI4th)— marshlands— conveyed by State—public trust—navigability**

An action seeking a determination of the quality of plaintiffs' titles to marshland originally obtained from the State was remanded where the trial court correctly rejected the lunar tides test and accepted the navigability in fact test in determining whether the waters in question in this case are navigable in law, but may have decided the issue of navigability in fact solely on the basis of whether the waters at issue were actually being used for or had historically been used for navigation, rather than on

the proper basis of whether the waters were such that navigation by pleasure or commercial watercraft was possible even if no watercraft had ever actually navigated on them. Although evidence of present or past actual navigation of the waters in question is evidence tending to support a finding that the waters are navigable in fact, such evidence will not be needed in every case in order to establish navigability in fact. Additionally, certain findings and conclusions of the trial court appear to be unclear, including, for example, the material facts found from stipulations and set forth in the judgment in respect to the properties conveyed.

**Am Jur 2d, Waters §§ 59-73.**

On discretionary review pursuant to N.C.G.S. § 7A-31, prior to a determination by the Court of Appeals, of a judgment for the plaintiffs entered by Llewellyn, J., on 12 August 1993 in Superior Court, New Hanover County. Heard in the Supreme Court 11 January 1995.

*Stephens, McGhee, Morgan, Lennon & O'Quinn, by Janet R. Coleman and Darren S. Hart, for plaintiff-appellees.*

*Michael F. Easley, Attorney General, by Daniel F. McLawhorn and J. Allen Jernigan, Special Deputy Attorneys General, and David W. Berry, Associate Attorney General, for defendant-appellant.*

*Thompson & Godwin, L.L.P., by Billy R. Godwin, Jr., and by Robert Kerry Kehoe, counsel, on behalf of Coastal States Organization, Inc., amicus curiae.*

MITCHELL, Chief Justice.

The parties stipulated at trial that the lands claimed by each of the plaintiffs that comprise the subject of this litigation are marshlands located between the high and low water marks in the Middle Sound area of New Hanover County. Title to the lands in question was conveyed by the State Board of Education (SBE) to the original purchasers of the marshlands between 1926 and 1945. Each of the deeds from the SBE to the original purchasers purports to convey a tract of "marshland" in the "Middle Sound" area to the purchasers, their "heirs and assigns in fee simple forever."[1] The parties stipulated that each of

---

1. The quoted language appears in each of the deeds except for the SBE deed to Paul Rogge through which the plaintiffs Cameron claim a portion of their land. The Rogge deed uses the word "land" instead of "marshland." That deed also has the words

## GWATHMEY v. STATE OF NORTH CAROLINA

[342 N.C. 287 (1995)]

the plaintiffs could establish a chain of title linking their deeds to the source deeds from the SBE, with one exception.[2]

In 1965, the General Assembly enacted N.C.G.S. § 113-205, which required individuals who claimed any part of the bed lying beneath navigable waters of any coastal county to register their claims with the Secretary of the Department of Natural Resources by 1 January 1970, or their claims would be null and void. The plaintiffs in this case, or their predecessors in interest, registered their claims in compliance with this statute. The parties stipulated that the plaintiffs' submerged lands claims, as originally filed, included both marshlands lying between the mean high and mean low water marks of Middle Sound and lands beyond the mean low water mark that lie beneath the open waters of Middle Sound or Howe Creek. In 1987, the Submerged Lands Program, which was established to assess the validity of the claims of title previously registered pursuant to N.C.G.S. § 113-205, came under the administration of the Division of Marine Fisheries. In assessing the plaintiffs' claims, the Division of Marine Fisheries issued resolution letters concluding that the plaintiffs had valid titles to the marshlands between the mean high and mean low water marks. However, pursuant to N.C.G.S. § 146-20.1(b), the resolution letters purporting to validate the plaintiffs' titles to the marshlands were accompanied in each case by a purported reservation of public trust rights in those same marshlands. The plaintiffs responded by filing separate complaints against the State between 26 February 1991 and 31 May 1991, in Superior Court, New Hanover County, seeking a determination of the quality of their titles to the marshlands and other relief. The plaintiffs' actions were consolidated by consent of all the parties following filing of the State's answer.

The State made a motion in the Superior Court for summary judgment on the ground that waters covering the lands in question are subject to the ebb and flow of the tides and are, thus, navigable as a matter of law. The State argued that, as the waters are navigable in law, title to the land beneath those waters is governed by the public trust doctrine, and such land is not subject to fee simple ownership by the plaintiffs. Judge G.K. Butterfield, Jr., denied the motion in an order concluding that the test for determining navigability in law in North Carolina is "navigability in fact."

"heirs and assigns" and later states that Rogge receives the land "in fee simple." The other deeds use the language "heirs and assigns in fee simple forever," all in one sentence.

2. We deal with the status of plaintiff Louise deRosset Smith's chain of title below in our discussion of the relevant issue presented by this appeal.

**GWATHMEY v. STATE OF NORTH CAROLINA**

[342 N.C. 287 (1995)]

This case then came on for trial without a jury in the Superior Court, New Hanover County, before Judge James D. Llewellyn. The trial court entered judgment for the plaintiffs on 12 August 1993.

The trial court found from substantial evidence before it that at low tide no boat of any size could navigate in the marshlands claimed by the plaintiffs, except in dredged channels. The trial court also found that "as to the marshlands claimed by Plaintiffs, at high tide the area covered by marsh grass is not navigable." Based upon its findings, the trial court concluded as a matter of law that no part of the marshlands on Middle Sound within the boundaries of the plaintiffs' deeds is covered by waters navigable in fact; therefore, those lands are not covered by waters that are navigable in law. The trial court further found that the open waters of Howe Creek are navigable in fact based upon actual current and historical use and, therefore, concluded that those open waters are navigable as a matter of law. The trial court also concluded that no public trust rights existed in the marshlands claimed by the plaintiffs and that the SBE had conveyed fee simple title to those lands to the plaintiffs' predecessors in title without reservation of any public trust rights. However, the trial court concluded that as to the land lying beneath the open waters of Howe Creek, the SBE had conveyed title subject to public trust rights. The trial court further concluded that "the 'Declaration of Final Resolution' recorded by the Defendant is a cloud upon each Plaintiff's title and is ineffective as a recognition of any right, title or interest of the public in the marshlands." The trial court then concluded that as the plaintiffs' marshlands were not beneath waters navigable in law, N.C.G.S. § 146-20.1(b) is "invalid as it purports to impress upon the marshlands owned by Plaintiffs public trust rights which did not exist in said lands at the time they were conveyed to Plaintiffs' predecessors in title."

Based upon its findings and conclusions, the trial court ordered, adjudged, and decreed that the plaintiffs were owners in fee simple absolute without any reservation of public trust rights of the "certain tract of marshlands described" in each of their deeds. With regard to the claims of the plaintiffs Richard and Gwendolyn Gwathmey, however, the trial court adjudged and decreed that "those areas of deeded bottom lying beneath the open waters of Howe Creek and within the boundaries of Plaintiffs' [Gwathmey] deed are owned in fee simple subject to the public trust."

GWATHMEY v. STATE OF NORTH CAROLINA

[342 N.C. 287 (1995)]

The defendant State of North Carolina gave notice of appeal. On 7 April 1994, this Court allowed the defendant's petition for discretionary review prior to a determination by the Court of Appeals.

Before addressing the specific issues raised on this appeal, we will briefly discuss the public trust doctrine and the operation of the entry laws in North Carolina. A brief introductory review of these two areas of the law at this point will facilitate an understanding of the issues raised on this appeal.

This Court has long recognized that after the Revolutionary War, the State became the owner of lands beneath navigable waters but that the General Assembly has the power to dispose of such lands if it does so expressly by special grant. *E.g., Shepard's Point Land Co. v. Atlantic Hotel*, 132 N.C. 517, 524, 44 S.E. 39, 41 (1903). However, "[l]ooming over any discussion of the ownership of estuarine marshes is the 'public trust' doctrine—a tool for judicial review of state action affecting State-owned submerged land underlying navigable waters, including estuarine marshland, and a concept embracing asserted inherent public rights in these lands and waters." Monica Kivel Kalo & Joseph J. Kalo, *The Battle to Preserve North Carolina's Estuarine Marshes: The 1985 Legislation, Private Claims to Estuarine Marshes, Denial of Permits to Fill, and the Public Trust*, 64 N.C. L. Rev. 565, 572 (1986) [hereinafter *Battle to Preserve N.C.'s Estuarine Marshes*].

In *Tatum v. Sawyer*, 9 N.C. 226 (1822), this Court recognized the importance of navigable waters as common highways and held: "Lands covered by navigable waters are not subject to entry under the entry law of 1777, not by any express prohibition in that act, but, being necessary for public purposes as common highways for the convenience of all, they are fairly presumed not to have been within the intention of the Legislature." *Id.* at 229. Thus, this Court has recognized the public interests inherent in navigable waters and qualified the State's ability to part with title to lands submerged by navigable waters with a *presumption* that legislative enactments do not indicate a legislative intent to authorize the conveyance of lands beneath navigable waters. *Atlantic & N.C. R.R. Co. v. Way*, 172 N.C. 774, 776-78, 90 S.E. 937, 938-40 (1916). The practical significance of this presumption under the public trust doctrine is that it can operate to invalidate claims to lands submerged by navigable waters. The issue of navigability is controlling because the public trust doctrine is not an issue in cases where the land involved is above water or where

the body of water regularly covering the land involved is not navigable in law. The public trust doctrine is discussed in more detail at other points in this opinion where we deal directly with the assignments of error.

This Court's discussions of navigability have arisen most often in cases where the parties claimed title to contested lands under grants obtained pursuant to the general entry laws. In 1777, the General Assembly enacted the entry laws,[3] also known as the "general entry laws." These laws established a system whereby the people of North Carolina could acquire the State's unappropriated vacant lands. The entry laws provided for the election of "entry-takers" and surveyors in every county. An individual who wished to acquire State land was first required to pay the statutory amount set for the quantity of land purchased in addition to the fees authorized by the laws. Subsequently, the surveyor was required to enter the lands claimed and survey them. The entry laws also provided that if part of the survey was made on any navigable water, the water was to form one boundary of the land surveyed. The law prescribed the manner in which the individual received a grant from the State for the land surveyed and in which that grant would be registered in the county in which the land was located.

By an assignment of error, defendant, the State of North Carolina, contends that the trial court erred in concluding that no public trust rights exist in the lands claimed by the plaintiffs. The State says this is so because those lands were not covered by waters "navigable in fact." More specifically, the State contends that the proper test for determining navigability in law where tidal waters are concerned is the "lunar tides" test, also known as the "ebb and flow" test. Under this test, "navigable waters are distinguished from others, by the ebbing and flowing of the tides." *Wilson v. Forbes*, 13 N.C. 30, 34 (1828) (Henderson, J.). We do not agree.

The evidence adduced at trial tended to show that the marshlands claimed by the plaintiffs are located in the Middle Sound area. The waters of Middle Sound are subject to the ebb and flow of the lunar tide. The marshlands in question are covered by the waters of the sound at certain stages of the tides. The depth of the water over any specific portion of the marshlands claimed by the plaintiffs varies

---

3. The summary of the entry laws at this point in this opinion is developed with particular reference to chapter 1 of the November 1777 Session Laws of North Carolina.

according to the level of the tide in the sound. The State argues that because the marshlands are covered at regular intervals by waters subject to the ebb and flow of the tides, they are covered by navigable waters under the lunar tides test and are not subject to private appropriation. Based on an extensive review of the law of this State regarding the test for "navigability in law" as that term applies to the public trust doctrine, we conclude that the State's argument must fail because it is premised on the applicability of the lunar tides test.

Under the common law as applied in England, the navigability of waters was determined by whether they were subject to the ebb and flow of the tides. This common law rule "developed from the fact that England does not have to any great extent nontidal waters which are navigable." *Home Real Estate Loan & Ins. Co. v. Parmele*, 214 N.C. 63, 68, 197 S.E. 714, 717 (1938).

[1] In one of this Court's earliest decisions dealing with the test to be applied for determining navigability in law, however, we expressly stated:

> It is clear that by the [lunar tides] rule adopted in England, navigable waters are distinguished from others, by the ebbing and flowing of the tides. But this rule is entirely inapplicable to our situation, arising both from the great length of our rivers, extending far into the interior, and the sand-bars and other obstructions at their mouths. By that rule Albemarle and Pamlico sounds, which are inland seas, would not be deemed navigable waters, and would be the subject of private property.

*Wilson v. Forbes*, 13 N.C. at 34-35. Justice Hall concurred in a separate opinion, stating:

> I think that part [the lunar tides test] of the English law is not applicable to the waters and streams of this State. But few of them could be marked by such a distinction. There can be no essential difference for the purposes of navigation, whether the water be salt or fresh, or whether the tides regularly flow and ebb or not. *And of this opinion the legislature seems to have been, when they passed the [general entry laws of 1715 and 1777].*

*Id.* at 38 (Hall, J.) (emphasis added).

N.C.G.S. § 4-1 provides:

> All such parts of the common law as were heretofore in force and use within this State, or so much of the common law as is not

destructive of, or repugnant to, or inconsistent with, the freedom and independence of this State and the form of government therein established, and which has not been otherwise provided for in whole or in part, not abrogated, repealed, or become obsolete, are hereby declared to be in full force within this State.

N.C.G.S. § 4-1 (1986). The "common law" referred to in N.C.G.S. § 4-1 has been held to be the common law of England as of the date of the signing of the American Declaration of Independence. *State v. Vance*, 328 N.C. 613, 403 S.E.2d 495 (1991); *Steelman v. City of New Bern*, 279 N.C. 589, 184 S.E.2d 239 (1971). In *State ex rel. Bruton v. Flying "W" Enters.*, 273 N.C. 399, 412, 160 S.E.2d 482, 491 (1968), we stated that the term "common law" as used in the statute "refers to the common law of England and not of any particular state." Although technically not erroneous, that statement is incomplete and may be misleading. At least after 1715, the common law of England was applicable in North Carolina only to the extent it was deemed "compatible with our way of living." *State v. Willis*, 255 N.C. 473, 474, 121 S.E.2d 854, 854 (1961); *see also State v. Lackey*, 271 N.C. 171, 155 S.E.2d 465 (1967). Further, the express wording of N.C.G.S. § 4-1 makes it clear that only those parts of the English common law which had been "in force and use" *in North Carolina* and which were not contrary to the freedom and independence of North Carolina are to be applied. Thus, the statement from *Bruton* quoted above is correct only if it is understood to mean that the "common law" to be applied in North Carolina is the common law of England to the extent it was in force and use within this State at the time of the Declaration of Independence; is not otherwise contrary to the independence of this State or the form of government established therefor; and is not abrogated, repealed, or obsolete. N.C.G.S. § 4-1. Further, much of the common law that is in force by virtue of N.C.G.S. § 4-1 may be modified or repealed by the General Assembly, except that any parts of the common law which are incorporated in our Constitution may be modified only by proper constitutional amendment. *State v. Mitchell*, 202 N.C. 439, 163 S.E. 581 (1932).

[2] In *Wilson*, this Court made it clear that the lunar tides test had never been part of the English common law applied in this State before or after the Revolution. *Wilson*, 13 N.C. 30. Therefore, it is not a part of the common law to be applied in North Carolina. Additionally, we indicated in *Wilson* that the lunar tides test was "obsolete," as it was inapplicable to the conditions of the waters within this State. *Id.* For both of these reasons, the lunar tides test is

**GWATHMEY v. STATE OF NORTH CAROLINA**

[342 N.C. 287 (1995)]

not a part of the common law as it applies in North Carolina. *See* N.C.G.S. § 4-1.

In *Collins v. Benbury*, 25 N.C. 277 (1842), this Court emphasized that "whether there was any tide or not in the [Albemarle] Sound, when this patent issued, we do not think material; for we concur in the opinion of his Honor that this is 'a navigable water,' in the sense of our [entry] statutes." *Id.* at 282. Thus, this Court reaffirmed its earlier conclusion in *Wilson* that the lunar tides test does not control when determining the navigability of waters in this State for purposes of applying the public trust doctrine.

There are two cases in which this Court erroneously applied the lunar tides test to determine the navigability in law of waters of this State. In the first, *Hatfield v. Grimstead*, 29 N.C. 139 (1846), the plaintiff's grant from the State included land covered by the waters of Currituck Sound near Currituck Inlet. Currituck Inlet had closed prior to the plaintiff's obtaining title from the State in 1839. A revisal of the general entry laws in 1836 left out the language in earlier versions of those statutes which had required that the water form one of the boundaries of property conveyed under the entry laws and lying along navigable water.[4] From this omission, this Court decided in *Hatfield* that the navigability of the water involved in that case must be determined by the English common law lunar tides test. The Court concluded that the plaintiff held valid title to the submerged lands in that case because, under the English common law, only waters affected by the ebb and flow of the tides were navigable. Since the plaintiff's land was not affected by the ebb and flow of the tides because of the closing of the inlet, this Court concluded that the entry laws in effect at the time of the grant did not proscribe the plaintiff's grant.

Assuming *arguendo* that the omission of the language in question from the revised entry laws concerning boundaries of lands on navigable bodies of water required that this Court look to the common law for its decision in *Hatfield*, it nevertheless was improper to apply the lunar tides test in that case. As discussed previously, this Court already had unequivocally indicated that the lunar tides test had never been a part of the common law to be applied for determining navigability in North Carolina. *Wilson*, 13 N.C. 30. Therefore, the

---

4. The general entry laws were again revised prior to this Court's decision in *Hatfield,* and the revised law reinstated the omitted provisions referred to in *Hatfield. Hatfield,* 29 N.C. at 140.

application of that test in *Hatfield* was error. In light of the foregoing, we expressly disavow the language in this Court's opinion in *Hatfield* to the extent it indicates that the lunar tides test was ever a part of the common law as applied in North Carolina.

In *Resort Dev. Co. v. Parmele*, 235 N.C. 689, 71 S.E.2d 474 (1952), the source of title for a portion of the disputed land originated in an entry law grant from the State in 1841. In that case, we held that the lunar tides test of the English common law must be applied to determine whether the waters covering that portion of the disputed land represented by the 1841 grant were navigable. This part of our decision was based on our prior erroneous interpretation of the law in *Hatfield* and also is hereby expressly disavowed.

Next, although the State has acknowledged this Court's clear rejection of the English lunar tides test in *Wilson* and in *Collins*, the State nevertheless argues that our summary of North Carolina law in *State v. Glen*, 52 N.C. 321 (1859), established a dual test for determining navigability in law in North Carolina. Its argument is based on the following language from *Glen*:

> 1. *All the bays and inlets on our coast, where the tide from the sea ebbs and flows*, and *all other waters, whether sounds, rivers, or creeks, which can be navigated by sea vessels*, are called navigable, in a technical sense, are altogether *publici juris*, and the soil under them cannot be entered and a grant taken for it under the entry law. In them, too, the right of fishing is free. *Collins v. Benbury*, 25 N.C.[]277, and the other cases to which we have referred on this point.

*Glen*, 52 N.C. at 333 (emphasis added). The State essentially argues that by using the words "where the sea ebbs and flows" to describe "[a]ll the bays and inlets on our coast," this Court indicated in *Glen* that the lunar tides test was a proper test for determining navigability, but not the sole and exclusive test. The State reads the remainder of the italicized language in the above quotation to mean that only the issue of the navigability of waters which are unaffected by the lunar tides is to be determined by whether they are navigable in fact. Accordingly, the State would have us hold that waters which meet either the test of navigability in fact or the lunar tides test are navigable in law. However, we are convinced that the language in *Glen* that refers to the ebb and flow of the tides is merely a phrase descriptive of all of the bays and inlets of the open ocean along our coast and has no independent legal significance.

The portion of the *Glen* opinion from which the above quotation was taken is but a summarization of cases previously reviewed in that opinion. Earlier in *Glen*, this Court stated that in England, navigability in law was ascertained by the ebb and flow of the tide. *Id.* at 325. We then said that the lunar tides or ebb and flow test

> has been held by our courts not to be applicable to the watercourses of North Carolina, and has been long since repudiated. We *hold* that *any waters*, whether sounds, bays, rivers, or creeks, which are wide enough and deep enough for the navigation of sea vessels, are navigable waters, the soil under which is not the subject of entry and grant under our entry law, and the rights of fishing in which are, under our common and statute law, open and common to all the citizens of the State.

*Id.* (emphasis added). *Glen* is not to be read to mean that there is a dual test for navigability which includes the lunar tides test when, in that opinion, this Court so clearly rejected the lunar tides test and expressly held that the test of navigability in fact controls in North Carolina. Additionally, in cases subsequent to this Court's decision in *Glen*, the lunar tides test was clearly rejected as an anachronistic tool, inapplicable to North Carolina's waters. *See, e.g., Home Real Estate Loan & Ins. Co. v. Parmele*, 214 N.C. 63, 197 S.E. 714; *Staton v. Wimberly*, 122 N.C. 107, 29 S.E. 63 (1898); *State v. Eason*, 114 N.C. 787, 19 S.E. 88 (1894).

[3] This Court was required to further explain the navigability in fact test in three cases near the beginning of the twentieth century. *State v. Twiford*, 136 N.C. 603, 48 S.E. 586 (1904); *State v. Baum*, 128 N.C. 600, 38 S.E. 900 (1901); *State v. Narrows Island Club*, 100 N.C. 477, 5 S.E. 411 (1888). Each of those cases involved criminal prosecutions on indictments charging the defendants with obstructing public navigation. In each case, the evidence showed that the waters of the sound in question were frequently navigated by boats of varying sizes. The defendants argued that a right existed to obstruct travel over the waters involved because the land covered by those waters was privately owned in fee pursuant to general entry law grants from the State.

In *Narrows Island Club*, this Court essentially assumed *arguendo* that the defendant's title to the land submerged by the water in question was valid. *Narrows Island Club*, 100 N.C. at 480, 5 S.E. at 412. In determining whether the public trust doctrine applied, the Court focused on the capacity of the waters for navigation by any "useful vessels" and concluded:

Navigable waters are natural highways, so recognized by government and the people, and hence it seems to be accepted as a part of the common law of this country arising out of public necessity, convenience and common consent, that the public have the right to use rivers, lakes, sounds and parts of them, though not strictly public waters, if they be navigable, in fact, for the purposes of a highway and navigation, employed in travel, trade and commerce. Such waters are treated as *publici juris*, in so far as they may be properly used for such purposes, in their natural state. The public right arises only in case of their navigability. Whether they are navigable or not depends upon their capacity for substantial use as indicated.

*Id.* at 481, 5 S.E. at 412.

In *State v. Baum*, 128 N.C. 600, 38 S.E. 900, this Court again reviewed the development of the common law of navigability and noted that much of it was inconsistent and inapplicable to conditions in the United States. The Court went on to say:

The rule now most generally adopted, and that which seems best fitted to our own domestic conditions, is that all watercourses are regarded as navigable in law that are navigable in fact. That is, that the public have the right to the unobstructed navigation as a public highway for all purposes of pleasure or profit, of all watercourses, whether tidal or inland, that are in their natural condition capable of such use.

*Id.* at 604, 38 S.E. at 901. Thus, this Court reiterated its holding in *Narrows Island Club* that navigability in fact by useful vessels, including small craft used for pleasure, constitutes navigability in law.

In *State v. Twiford*, 136 N.C. 603, 48 S.E. 586, this Court reemphasized that "[i]f a stream is 'navigable *in fact* . . . it is navigable in *law*.' The capability of being used for purposes of trade and travel in the usual and ordinary modes is the test, and not the extent and manner of such use." *Id.* at 606, 48 S.E. at 587 (citations omitted). By applying the foregoing test, we determined that the waters covering the land in question were navigable. *Id.* at 608, 48 S.E. at 588. As in *Narrows Island Club* and *Baum*, the basis for the defendants' claim in *Twiford* that they had a right to obstruct the waters was an assertion of fee simple ownership of the underlying land free of public trust rights. In *Narrows Island Club*, we had explicitly found it unnecessary to decide whether the title to the underlying land was

affected by our determination that the waters were navigable. Significantly, we addressed this issue in *Twiford*. Our decision that the defendants had illegally obstructed the water in question in *Twiford* was based in part, if not entirely, on our conclusion that the land was not subject to entry and grant to a private party by the State under the general entry laws because it was covered by navigable waters. *Id.* at 607, 48 S.E. at 587.

The controlling law of navigability as it relates to the public trust doctrine in North Carolina is as follows: " 'If water is navigable for pleasure boating it must be regarded as navigable water, though no craft has ever been put upon it for the purpose of trade or agriculture. The purpose of navigation is not the subject of inquiry, but the fact of the capacity of the water for use in navigation.' " *Id.* at 608-09, 48 S.E. at 588 (quoting *Attorney General v. Woods*, 108 Mass. 436, 440 (1871)). In other words, if a body of water in its natural condition can be navigated by watercraft, it is navigable in fact and, therefore, navigable in law, even if it has not been used for such purpose. Lands lying beneath such waters that are navigable in law are the subject of the public trust doctrine. For the foregoing reasons, the State's assignment of error is without merit.

[4] By another assignment of error, the State contends that the SBE was never vested with title to the marshlands free of public trust rights and, as a result, could not convey such title to the plaintiffs' predecessors in interest.

The State's first argument in support of this assignment of error is based on the assumption that the lands at issue are submerged by navigable waters governed by the public trust doctrine and that, as a result; the legislature could do nothing which would impair public trust interests in them. It is true that lands submerged by waters which are determined to be navigable in law are subject to the public trust doctrine. However, the assumption that such lands may not be conveyed by the General Assembly without reservation of public trust rights is incorrect.

The State's argument that the public trust doctrine prevents the State from conveying lands beneath navigable waters without reserving public trust rights is based principally on two cases. The first is *Shepard's Point Land Co. v. Atlantic Hotel*, 132 N.C. 517, 44 S.E. 39, which involved competing claims to waterfront property in Morehead City based on general entry law grants. The defendant's property consisted of dry land on the shore of Bogue Sound. The land claimed by

GWATHMEY v. STATE OF NORTH CAROLINA

[342 N.C. 287 (1995)]

the plaintiff was submerged by the navigable waters of Bogue Sound and was located directly in front of the defendant's waterfront property. Before reaching its ultimate conclusion, this Court quoted the following language from a United States Supreme Court case: " 'The control of the State for the purposes of the [public] trust can never be lost except as to such parcels as [1] are used in promoting the interests of the public therein or [2] can be disposed of without any substantial impairment of the public interest in the lands and waters remaining.' " *Id.* at 527, 44 S.E. at 42 (quoting *Illinois Cent. R. Co. v. Illinois*, 146 U.S. 387, 453, 36 L. Ed. 1018, 1042 (1892), *aff'd sub nom. United States v. Illinois Cent. R. Co.*, 154 U.S. 225, 38 L. Ed. 971 (1894)).[5]

The State contends that the validity of any conveyance of land encumbered with the public trust must be judged with reference to the principles enunciated in *Shepard's Point Land Co.* That case is not controlling. The quoted statement was *obiter dictum* in *Shepard's Point Land Co.* because in that case the plaintiff's claim of title was based on the general entry laws. This Court based its decision to reject the plaintiff's claim on the well-established principle that lands submerged by navigable waters are not subject to entry *under the general entry laws*. We reject the above statement in *Shepard's Point Land Co.* to the extent that it implies that the public trust doctrine completely prohibits the General Assembly from conveying lands beneath navigable waters to private parties without reserving public trust rights. That position is without authority in either our statutes or our Constitution.

In *State v. Twiford*, 136 N.C. 603, 48 S.E. 586, this Court said: "Navigable waters are free. They cannot be sold or monopolized. They can belong to no one but the public and are reserved for free and unrestricted use by the public for all time. Whatever monopoly may obtain on land, the waters are unbridled yet." *Id.* at 609, 48 S.E. at 588. To the extent that this statement in *Twiford* can be read expansively to indicate that the General Assembly does not have the power to convey lands underlying navigable waters in fee, it too was mere *obiter dictum*, unsupported by our laws or our Constitution, and is hereby expressly disapproved.

In *State ex rel. Rohrer v. Credle*, 322 N.C. 522, 369 S.E.2d 825 (1988), this Court said:

5. It is worth noting that the Supreme Court in *Illinois Central* admitted that no authority supported its position. *Illinois Cent. R. Co.*, 146 U.S. at 455, 36 L. Ed. at 1043. More importantly, that case did not involve North Carolina law.

GWATHMEY v. STATE OF NORTH CAROLINA

[342 N.C. 287 (1995)]

> Navigable waters, then, are subject to the public trust doctrine, insofar as this Court has held that where the waters covering land are navigable in law, those lands are held in trust by the State for the benefit of the public. A land grant in fee embracing such submerged lands is void.

*Id.* at 527, 369 S.E.2d at 828 (citing *Shepard's Point Land Co.*, 132 N.C. 517, 44 S.E. 39). The first sentence is entirely consistent with our opinion in this case. The second sentence is true in the sense that a land grant in fee *pursuant to the general entry laws* and conveying such submerged lands is void. However, we hereby expressly reject any construction of the second sentence in the above quotation from *Credle* that would support the proposition that the General Assembly is powerless to convey lands lying beneath navigable waters free of public trust rights when it does so by special legislative grant. To construe the second sentence so broadly would conflict with the long-established rule of *Ward v. Willis*, 51 N.C. 183 (1858) (per curiam), that fee simple conveyances—without reserving rights to the people under the public trust doctrine—of lands beneath navigable waters pursuant to special legislative grants are valid. Further, our construction of the second sentence recognizes that in *Rohrer* this Court relied on cases involving grants under the general entry laws to support its statement in the second sentence. Thus, we are only limiting the statement there to the precedent established in those cases.

In *Credle*, we also quoted with approval *dictum* from our decision in *Twiford* to the effect that lands under navigable waters can never be conveyed in fee simple. *Credle*, 322 N.C. at 534, 369 S.E.2d at 832 (quoting *Twiford*, 136 N.C. at 609, 48 S.E. at 588). For reasons previously discussed in our analysis of *Twiford* in this opinion, we expressly disavow any such statements.

In *Martin v. N.C. Housing Corp.*, 277 N.C. 29, 175 S.E.2d 665 (1970), this Court restated the long-established principle that " 'under our Constitution, the General Assembly, so far as that instrument is concerned, is possessed of full legislative powers unless restrained by express constitutional provision or necessary implication therefrom.' " *Id.* at 41, 175 S.E.2d at 671 (quoting *Thomas v. Sandlin*, 173 N.C. 329, 332, 91 S.E. 1028, 1029 (1917)). Similarly, in *State ex rel. Martin v. Preston*, 325 N.C. 438, 385 S.E.2d 473 (1989), we emphasized that "[a]ll power which is not expressly limited by the people in our State Constitution remains with the people, and an act of the people through their representatives in the legislature is valid unless pro-

hibited by that Constitution." *Id.* at 448-49, 385 S.E.2d at 478 (citing *McIntyre v. Clarkson*, 254 N.C. 510, 515, 119 S.E.2d 888, 891 (1961)).

No constitutional provision throughout the history of our State has expressly or impliedly precluded the General Assembly from conveying lands beneath navigable waters by special grant in fee simple and free of any rights arising from the public trust doctrine. *See Battle to Preserve N.C.'s Estuarine Marshes*, 64 N.C. L. Rev. at 576-77. The public trust doctrine is a common law doctrine. In the absence of a constitutional basis for the public trust doctrine, it cannot be used to invalidate acts of the legislature which are not proscribed by our Constitution. Thus, in North Carolina, the public trust doctrine operates as a rule of construction creating a presumption that the General Assembly did not intend to convey lands in a manner that would impair public trust rights. "Unless clear and specific words state otherwise, terms are to be construed so as to cause no interference with the public's dominant trust rights, for the presumption is that the sovereign did not intend to alienate such rights." *RJR Technical Co. v. Pratt*, 339 N.C. 588, 590, 453 S.E.2d 147, 149 (1995). However, this presumption is overcome by a special grant from the General Assembly *expressly* conveying lands underlying navigable waters in fee simple and without reservation of any public trust rights. *See Ward v. Willis*, 51 N.C. at 185-86.

For the foregoing reasons, we conclude that the General Assembly is not prohibited by our laws or Constitution from conveying in fee simple lands underlying waters that are navigable in law without reserving public trust rights. The General Assembly has the power to convey such lands, but under the public trust doctrine it will be presumed not to have done so. That presumption is rebutted by a special grant of the General Assembly conveying the lands in question free of all public trust rights, but only if the special grant does so in the clearest and most express terms.

[5] The State also argues in support of this assignment of error that the General Assembly has never conveyed any marshlands covered by navigable waters to the SBE free of public trust rights and, therefore, that the SBE could not convey any such lands free of such public trust rights. The 1825 General Assembly passed an act to "create a fund for the establishment of Common Schools." Act of Jan. 4, 1826, Ch. I, 1825 N.C. Sess. Laws 3. This act created a "body corporate and politic, under the name of the President and Directors of the Literary Fund" and named the Governor as President of the Board which was

to administer the Literary Fund. Ch. I, sec. II, 1825 N.C. Sess. Laws at 3-4. The fund consisted of the appropriations made by the legislature and included, *inter alia*, "all the vacant and unappropriated Swamp lands in this State." Ch. I, sec. I, 1825 N.C. Sess. Laws at 3. In 1833, the legislature passed a resolution which made it clear that it had originally conveyed title to all vacant marshlands to the Literary Fund by the 1825 act. The resolution stated: "[A]ll the vacant and unappropriated *marsh and swamp lands* in this State were, by the law passed in 1825, actually transferred, and do now belong to the Literary Fund of this State." Resolution of the Committee on Education and the Literary Fund, 1833 Leg. Docs., No. 15 (emphasis added), *quoted in* Kenneth B. Pomeroy & James G. Yoho, *North Carolina Lands: Ownership, Use, and Management of Forest and Related Lands* 98 (1964) [hereinafter *N.C. Lands*].

In 1837, the legislature reorganized the Board of the Literary Fund. *See* David A. Rice, *Estuarine Land of North Carolina: Legal Aspect of Ownership, Use and Control*, 46 N.C. L. Rev. 779, 787 (1968); *see also N.C. Lands* at 99. In the 1837 enactment, the legislature stated that "all the swamp lands of this State, not heretofore duly entered and granted to individuals, shall be vested in the [Literary Fund]." Act of Jan. 20, 1837, ch. XXIII, sec. 3, 1836-37 N.C. Sess. Laws 131, 131-32 (an act to drain swamplands and create Literary Fund). The act then gave the Board "full power and authority to adopt all necessary ways and means, for causing so much of the swamp lands aforesaid to be surveyed, as they may think capable of being reclaimed." Ch. XXIII, sec. 5, 1836-37 N.C. Sess. Laws at 132. Finally, the law empowered the Board to "sell and convey any part of the lands, which may be reclaimed, for the best price that can be obtained for the same; and the title of the purchaser or purchasers, shall be good and valid in law and in equity." Ch. XXIII, sec. 11, 1836-37 N.C. Sess. Laws at 134. Thus, the legislature reiterated its grant of the marshlands and swamplands within the State to the Literary Fund and authorized the Board to set up a system whereby those lands would be surveyed and sold by the Board.

The Constitution of 1868 provided that the SBE "shall succeed to all the powers and trusts of the President and directors of the Literary Fund of North Carolina, and shall have full power to legislate and make all needful rules and regulations in relation to . . . the Educational fund of the State." N.C. Const. of 1868, art. IX, § 9. Thus, title to the State's vacant marshlands and swamplands was vested in

the newly created SBE. *See Home Real Estate Loan & Ins. Co. v. Parmele*, 214 N.C. at 70, 197 S.E. at 719.

In 1891, the General Assembly reaffirmed what it had said previously by its resolution in 1833: "[T]he words 'swamp lands' employed in the statutes creating the literary fund and literary board of North Carolina and the state board of education of North Carolina, or in any act in relation thereto, shall be construed to include all those lands which have been or may now be known and called 'swamp' or 'marsh' lands . . . ." Act of Mar. 4, 1891, ch. 302, 1891 N.C. Sess. Laws 254. This enactment did not amend the previous statutes to reflect a change in the law, but merely restated the legislative intent concerning a term within them. Thus, either the Board of the Literary Fund or the SBE as its successor in interest was at all times vested with title to the vacant marshlands and swamplands in the State after the 1825 act. Title to those lands continued to be held by the SBE until our statutes regarding the control and disposition of all state lands were amended in 1959. *See* N.C.G.S. §§ 146-1 to -83 (1959).

The State contends in support of this assignment of error, however, that even if the legislature conveyed title to the marshlands at issue to the SBE, it did not convey to the SBE any of those marshlands covered by navigable waters in fee simple without reservation of public trust rights for the people of this State. The State further contends that since the SBE never received title to such lands free of the public trust rights of the people, it could not convey title free of those public trust rights to the plaintiffs' predecessors in interest. We agree.

In addressing these contentions by the State, we must consider the statutes concerning the authority of the Board of the Literary Fund and the SBE with regard to the marshlands. Our review of the laws governing the sale of vacant swamplands and marshlands reveals that each of the relevant statutes in effect between 1837 and 1959 contained the following language or its equivalent:

The state board of education is invested with full power to adopt all necessary ways and means for causing so much of the swamp lands to be surveyed as it may deem capable of being reclaimed, and shall cause to be constructed such canals, ditches, roads, and other necessary works of improvement as it may deem proper and necessary.

N.C.G.S. § 146-78 (1943); *see also* 2 N.C. Cons. Stat. § 7605 (1919); 2 N.C. Rev. § 4036 (1905); 2 N.C. Code § 2508 (1883); 1854 Rev. Code, Ch. 66, § 5; Ch. XXIII, sec. 5, 1836-37 N.C. Sess. Laws at 132. Further, in the statutes the legislature authorized the sale of the marshlands by the following language or its equivalent:

> The state board of education is authorized and directed to sell and convey the swamp lands [including marshlands] at public or private sale at such times, for such prices, in such portions, and on such terms as to it may seem proper . . . . The proceeds, as also money received on entries of vacant land, shall become a part of the state literary fund.

N.C.G.S. § 146-94 (1943); *see also* 2 N.C. Cons. Stat. § 7621 (1919); 2 N.C. Rev. § 4049 (1905); 2 N.C. Code § 2514 (1883); 1854 Rev. Code, ch. 66, § 11; Ch. XXIII, sec. 11, 1836-37 N.C. Sess. Laws at 134.

In no statute enacted by the General Assembly from 1825 to the present has that body ever expressly stated that it was granting the Literary Fund or the SBE fee simple title to the marshlands free of all public trust rights whatsoever. Therefore, the presumption arising under the public trust doctrine that the General Assembly did not convey title free of public trust rights has not been rebutted and prevails in this case. Applying that presumption, we must conclude that the General Assembly did not convey the marshlands covered by navigable waters to the SBE free of any applicable public trust rights and, therefore, that the SBE could not convey such lands to the plaintiffs' predecessors in title free of such public trust rights. Thus, we conclude that to the extent, if any, the marshlands at issue in this case are covered by navigable waters, the people of North Carolina retain their full public trust rights.

[6] By other assignments of error, the State contends that the trial court erred in holding that N.C.G.S. § 146-20.1(b) "is invalid as it purports to impress upon the marshlands owned by Plaintiffs public trust rights which did not exist in said lands at the time they were conveyed to Plaintiffs' predecessors in title." We need not address the precise contention presented here. It appears that the trial court based this holding on its conclusion that the marshlands within the boundaries of the plaintiffs' deeds were never covered by navigable waters, and therefore no public trust rights exist in them. If this is so, N.C.G.S. § 146-20.1(b) simply does not apply to these plaintiffs' claims. The General Assembly has provided: "No provision of this Chapter [146] shall be applied or construed to the detriment of vested

rights [or] interests . . . acquired prior to June 2, 1959." N.C.G.S. § 146-83 (1991). Thus, to apply N.C.G.S. § 146-20.1 to impose public trust rights on any parts of the plaintiffs' marshlands not covered by navigable waters and which therefore are free of public trust rights in this case would be contrary to N.C.G.S. § 146-83.

[7] By another assignment of error, the State contends that the trial court erred as a matter of law when it expanded plaintiff Louise deR. Smith's complaint to add an allegation inconsistent with a stipulated fact. We disagree.

Prior to trial, the parties entered certain stipulations of fact to narrow the issues. The State contends that the parties stipulated to the boundaries of the various tracts of submerged lands and to the plaintiffs' chains of title. Moreover, the State contends that the judgment of the trial court adopted stipulations saying (1) the mean low water mark of Middle Sound is the landward boundary of the 1926 deed from the SBE to J.F. Roache and wife, the sole source of title asserted by the plaintiff Smith; and (2) Smith lacked a connected chain of title to that deed for the lands between the mean high and low water marks.

The trial court adopted the following relevant stipulated facts:

GG. Louise deR. Smith has linked her chain of title for that portion of said submerged land lying waterward (in southeasterly direction) of the mean low water mark of Middle Sound and landward of the western right-of-way line of the Intracoastal Waterway to a deed from the State Board of Education to J.F. Roache . . . and wife, Edith M. Roache dated April 26, 1926 and recorded in Book 173 at Page 309.

HH. Louise deR. Smith has not linked her chain of title for the marshland lying between the mean high and mean low water marks at the western shoreline of Middle Sound to the Roache Board of Education deed. The western (landward) boundary of the Roache Board of Education deed is the mean low water mark at the western shoreline of Middle Sound; therefore, the Roache deed does not describe the marshland located to the west (landward) of the mean low water mark of Middle Sound.

Taken in the context of the entire judgment of the trial court, we conclude that the stipulation and the foregoing findings of the trial court that the plaintiff Smith "has not linked her chain of title for the marshland lying between mean high and mean low water marks . . . to

the deed from the SBE to the Roaches" was not truly a stipulation that there was any break in Smith's chain of title; instead, it was a stipulation that the description of the property in the deed from the SBE to the Roaches did not include a metes and bounds description that included "the marshland lying between the mean high and mean low water marks at the western shoreline of Middle Sound."

The stipulations, although unartfully drawn, were stipulations as to the description contained within the SBE deed to the Roaches and were not stipulations concerning the accuracy of the description contained therein or concerning any gap in the chain of title. The parties could only stipulate to the facts which were contained in the deed itself. However, what the boundaries of a deed are is a question of law for the court; where they are is a question of fact for the jury. *Moore v. Whitley*, 234 N.C. 150, 66 S.E.2d 785 (1951); *Tatem v. Paine*, 11 N.C. 64 (1825).

Even though stipulations are encouraged by the courts, they will be restricted to the intent manifested by the parties in the agreement. *Rickert v. Rickert*, 282 N.C. 373, 193 S.E.2d 79 (1972). "[I]n ascertaining the intentions of the parties, the language employed in the agreement will not be construed in such a manner that a fact which is obviously intended to be controverted is admitted or that a right which is plainly not intended to be waived is relinquished." *Outer Banks Contractors v. Forbes*, 302 N.C. 599, 604-05, 276 S.E.2d 375, 380 (1981) (citing *Rickert v. Rickert*, 282 N.C. 373, 193 S.E.2d 79). The trial court, in construing the stipulations entered into by plaintiff Smith, properly concluded that plaintiff Smith did not intend to admit anything other than what the deed said and did not intend to waive any rights concerning her claim to marshland located between the high and low water marks of Middle Sound.

The trial court recognized that "a mistake or apparent inconsistency in a deed description shall not be permitted to defeat the intent of the parties if the intent appears in the deed." *Miller v. Miller*, 34 N.C. App. 209, 211, 237 S.E.2d 552, 554 (1977). The Roache deed contains the following description:

BEGINNING at an iron pipe near the high water mark of Middle Sound, said iron pipe being O.T. Wallace's southeast corner and the northeast corner of the sub-division known as "Queene Point", and running thence:

1. South 42 degrees 55 minutes east with the line of O.T. Wallace's [m]arsh land about four-thousand nine-hundred (4900) feet to the center of the Banks Channel.

2. Thence in a southwesterly direction with the center of said Banks Channel, taking in and including all the marsh land two-thousand four-hundred (2400) feet to a corner in the center of said Banks Channel.

3. Thence north 42 degrees 30 minutes west five-thousand one-hundred (5100) feet to an iron pipe in the center of Barren Inlet Creek. ([I]f the southeast end of this line be extended it will pass through a point "D" shown on the attached map, said point "D" can be accurately located, as it is tied to the mainland by tri-angulation from the U.S. Coast Survey Triangulations Stations. Said point "D" is also located in approximately the center of the property line that divided the Banks land owned by George H. Hutaff and Chas. B. Parmele. The next course ties the northwest end of this line so that the line can be definately [sic] located[.])

4. Thence north 37 degrees east five-hundred (500) feet to a concrete monument located near the high water mark on "Queene Point".

5. Thence in a northeasterly direction along the low water mark of the main land one-thousand eight-hundred (1800) feet to the beginning.

The trial court found that the intent of the parties in the SBE deed to the Roaches was to convey those lands between the mean high water mark and the mean low water mark of Middle Sound. We agree that a careful reading of the Roache deed manifests this intent, as the beginning point of the deed is the high water mark of Middle Sound, and the description returns to this point, but then says "along the *low* water mark . . . to the beginning." (Emphasis added.) The trial court did not err in concluding that the use of the word "low" rather than "high" was a mere clerical error in the deed description and correcting that error in its judgment. Accordingly, this assignment of error is without merit.

[8] In conclusion, we must vacate the judgment of the trial court and remand this case to the trial court for its further consideration. The trial court correctly rejected the lunar tides test and accepted the navigability in fact test in determining whether waters in question in this case are navigable in law. However, it appears that the trial court may

have decided the issue of navigability in fact in this case solely on the basis of whether the waters at issue were actually being used for or had historically actually been used for navigation, rather than on the proper basis of whether the waters were such that navigation on them by watercraft was possible even if no watercraft had ever actually navigated on them. As we have indicated in this opinion, whether waters are navigable in fact is to be determined by their capacity to support watercraft used for pleasure or commercial purposes, not by whether they ever have actually been used for purposes of navigation. In this connection, although evidence of present or past actual navigation of the waters in question is evidence tending to support a finding that the waters are navigable in fact, such evidence will not be needed in every case in order to establish navigability in fact.

Additionally, certain findings and conclusions of the trial court appear to be unclear. For example, the trial court found upon stipulations that the lands at issue in this case were marshlands between the high water mark and the low water mark of the sound. Further, the trial court found that at the time the SBE conveyed the lands in question to the plaintiffs' predecessors in title, those lands were comprised entirely of marshlands. Nevertheless, in addition to settling the status of the plaintiffs' titles to marshlands, the trial court's judgment also purports to settle questions of title with regard to lands underlying the open and navigable waters of Howe Creek.

We imply no criticism here of the able trial court. As we have indicated throughout this opinion, the law involving the public trust doctrine has been recognized by this and other courts as having become unnecessarily complex and at times conflicting. However, the material facts found from the stipulations of the parties and set forth in the judgment leave us in a sufficient state of apparent inconsistency and conflict in respect to the properties conveyed that we cannot safely reach a final resolution as to the rights of the parties before us on appeal. In such situations, it is necessary to vacate the judgment of the trial court and remand to the trial court in order that it may have the opportunity to determine the facts presented for decision accurately and truly upon a proper interpretation of the applicable law. *Lackey v. Hamlet City Bd. of Educ.*, 257 N.C. 78, 125 S.E.2d 343 (1962); see generally 1 Strong's North Carolina Index 4th *Appeal and Error* § 517 (1990), and cases cited therein. Accordingly, the judgment in this case is vacated, and this case is remanded to Superior Court, New Hanover County, for such further proceedings, not inconsistent with this opinion, "as to justice appertains and the rights of the par-

ties may require." *Calaway v. Harris*, 229 N.C. 117, 120, 47 S.E.2d 796, 798 (1948).

JUDGMENT VACATED AND CASE REMANDED.